221 N.J. Super. 131 (1987)
534 A.2d 35
IVY HILL PARK APARTMENTS AND OUTSTATE REALTY CORP., A NEW YORK CORPORATION, PLAINTIFFS-APPELLANTS,
v.
NEW JERSEY PROPERTY LIABILITY INSURANCE GUARANTY ASSOCIATION, NEW JERSEY SURPLUS LINES INSURANCE GUARANTY FUND, HAZEL FRANK GLUCK, THE COMMISSIONER OF INSURANCE OF THE STATE OF NEW JERSEY, RUTH LIEBERFARB AND CARL LIEBERFARB AND AGNES F. ELLIOT AND GEORGE ELLIOT, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 27, 1987.
Decided November 17, 1987.
*133 Before Judges SHEBELL, GAYNOR and STEIN.
Philip J. Battaglia argued the cause for appellants (Goldman, Carlet, Garrison, Bertoni & Klein, attorneys; Philip J. Battaglia, on the brief).
Cynthia J. Borrelli argued the cause for respondents New Jersey Property Liability Insurance Guaranty Association and New Jersey Surplus Lines Insurance Guaranty Fund (Stryker, Tams & Dill, attorneys; Cynthia J. Borrelli, on the brief).
Debbie J. Thompson, Deputy Attorney General, argued the cause for respondent Commissioner of Insurance (W. Cary Edwards, Attorney General, attorney; Michael R. Clancy, Deputy Attorney General, of counsel; Debbie J. Thompson, on the brief).
The opinion of the court was delivered by SHEBELL, J.A.D.
Plaintiffs Ivy Hill Park Apartments (Ivy Hill) and Outstate Realty Corp. brought an action in the Law Division to compel the Commissioner of Insurance (Commissioner), the New Jersey Property Liability Insurance Guaranty Association (Association) and the New Jersey Surplus Lines Insurance Guaranty Fund (Fund) to pay the balance due on the settlements of two personal injury claims and to restrain the claimants from executing on plaintiffs' property to satisfy the judgments entered on the settlements.
Plaintiffs were insured for liability by the Ambassador Insurance Company (Ambassador) at the time the injuries were sustained; Ambassador, however, became insolvent. The Fund, under authority of the New Jersey Surplus Lines Insurance *134 Guaranty Fund Act, N.J.S.A. 17:22-6.70 et seq. (Act), paid 40% of the settlements agreed upon, but has declined to make further payments at the present time. The court denied relief and dismissed the action against the Commissioner on the ground that jurisdiction lay with the Appellate Division.
Plaintiffs appeal, contending that the Act obligates the Fund to pay all claims that Ambassador would have covered and provides it with an unlimited source of income to pay these claims. Plaintiffs further argue that the court erred in dismissing their claim against the Commissioner since the Fund's obligation to pay the claims was a ministerial duty and an action in the Law Division to compel performance of such a duty was proper.
Outstate Realty Corp. is the owner of Ivy Hill Park Apartments, a 2,100-unit complex located in Newark. On September 5, 1984, the Vermont Superior Court declared Ambassador insolvent and ordered its liquidation. At that time there were claims against Ivy Hill by Carl and Ruth Lieberfarb and Agnes and George Elliot, on which lawsuits were subsequently filed. The Elliots' suit was settled for $75,000 by consent order which prevented Ivy Hill from selling its property before full payment of the settlement. The order also provided that if the settlement was not paid within a year, the Elliots could move for an order of judgment, and interest on the $75,000 would begin to run. The Lieberfarbs' suit was settled for $16,800. The settlement required that if Ambassador or the Fund failed to pay the settlement in 11 months, then Ivy Hill would become obligated to pay any amount remaining unpaid within seven days, or a judgment with interest would be entered against Ivy Hill. Plaintiffs represented that both settlements were investigated and approved by the Fund.
The Legislature passed the Act specifically in response to the insolvency of Ambassador. It created a fund to pay covered claims under policies issued by eligible, insolvent surplus lines *135 insurers,[1] such as Ambassador. See Introductory Statement, Assembly, No. 2273-L. 1984, c. 101. The Act took effect on July 27, 1984. L. 1984, c. 101, § 16.
On May 29, 1985, the Commissioner issued an order directing the Fund to "begin payment of Ambassador-related covered claims ... in the amount of 40% of the principal amount of each such covered claim...." The order recited that the "Fund, subject to the issuance of an order by the Commissioner to the contrary, shall be obligated, over time, to pay the full amount of all Ambassador-related covered claims in accordance with the provisions of the Act," but that no payments in excess of 40% were to be made until further order of the Commissioner. The Commissioner's decision was based on the purported fact "that the monies currently available in the Fund are insufficient to permit full, immediate payment of all Ambassador-related covered claims as they mature...." Because of the Fund's finances the Commissioner found it "necessary to adjust the Fund's obligations for the payment of covered claims in accordance with the Act...."
In his February 18, 1987 affidavit filed by leave of this court, John A. Conover, Sr., the individual designated by the Commissioner to oversee the administration of the Fund, offered the following regarding the Fund's financial status and the reasons for the Commissioner's order:
6. As of December 31, 1986 the total amount of money the Fund had collected was approximately $14,626,000. Three million dollars of that total was comprised of two loans from the New Jersey Property Liability Guaranty Association (hereafter "the Association") as authorized by N.J.S.A. 17:22-6.75(a)(2). The balance of $11,626,000 represents the amounts collected by imposition of a one-time statutorily authorized $25,000 assessment against each of the 34 surplus lines insurers eligible to do business in New Jersey, and through imposition upon those carriers of policy surcharges in the statutorily mandated maximum amount of 4% of the premiums written in this State by those carriers.

*136 7. As of December 31, 1986 the Fund had paid out a total of $9,207,000 on 1,414 Ambassador claims, including the claims of the plaintiffs. This $9,207,000 amount represented a payment of 40% of the amount due on each of those 1,414 claims pursuant to the Commissioner's order. The unpaid 60% portion of those claims is $13,347,000.
8. As of December 31, 1986 there were 2,419 Ambassador claims still pending for which even the initial 40% payment had not yet been made. The total amount reserved for payment of the 40% portion of those claims was $17,286,000.
9. As of December 31, 1986 there was approximately $709,114 in the Fund's bank account. As of the date of this affidavit that figure is approximately $1,308,250.
10. If the Commissioner were directed to authorize immediate payment of the 60% balance due on the 1,414 claims that have already been partially paid, it is obvious that the amount required to make such payments far exceeds the money presently available to the Fund. Such a directive would also mean that the Fund would be unable to make full or even partial payment to the presently remaining and future Ambassador claimants that to date have not received even the 40% portion of their claims.
The affiant further pointed out that the Fund had not yet started repaying the $3,000,000 loan from the Association and that "[a]ny additional loans at this time would saddle the Fund with additional debt that it cannot afford and, if made by the Association, would weaken the financial status of the Association."
Conover "estimated as of August 1986 that if the then present level of premium surcharge remained constant and the number of covered claims did not exceed the then current expectations, all covered Ambassador claims could conceivably be paid within the next six to eight years." He further noted that if the Legislature passed Senate Bill No. 788 (1986) making the Fund's coverage applicable to the covered claims of another insolvent insurer, payment of the Ambassador claims would be "seriously delayed."
Plaintiffs represent that judgments were entered against Ivy Hill for the amounts of the settlements in excess of 40% and that plaintiff has paid $10,800 plus interest and costs as to Lieberfarb and has posted a bond for the Elliot claim of $45,000 which must now be paid. Plaintiffs assert that their financial *137 status will be seriously impaired if they are not held harmless by the Fund as to these claims and other pending claims.
Plaintiffs urge "that the law independently obligates the Fund to the extent of the covered claims filed against the insolvent insurer irrespective of the power given to the Commissioner of Insurance." They further maintain that the statute establishing the Fund provides it with "an unlimited source of income from member insurers, as well as any outside financial sources and the Guaranty Association" and that such source of income "can be tapped to immediately pay existing covered claims as well as the power to make later assessments to meet any further claims."
The Act's stated purpose is
to provide a mechanism for the payment of covered claims under certain insurance policies issued by eligible surplus lines insurers; to avoid excessive delays in the payment of the covered claims against insolvent, eligible, nonadmitted insurers; and to avoid financial loss to claimants or policyholders because of the insolvency of an eligible, nonadmitted insurer. [N.J.S.A. 17:22-6.71; emphasis added].
The Association is charged with managing and administering the Fund. N.J.S.A. 17:22-6.73. Among the Fund's obligations, powers and duties are the following:
a. The fund shall:
(1) be obligated to the extent of the covered claims against an insolvent insurer. ... The fund's obligation for covered claims shall not be greater than $300,000.00 per occurrence, subject to any applicable deductible contained in the policy. The commissioner may adjust the fund's obligations for covered claims based on the monies available in the fund. In no event shall the fund be obligated to a policyholder or claimant in excess of the limits of liability of the insolvent insurer stated in the policy from which the claim arises;
(2) be deemed the insurer to the extent of its obligation on the covered claims and to such extent shall have all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent;
(3) assess member insurers in accordance with section 6 of this act in amounts necessary to pay:
(a) obligations of the fund under paragraph (1) of this subsection,
(b) expenses of handling covered claims,
(c) any other expenses incurred in the implementation of the provisions of this act;

*138 [N.J.S.A. 17:22-6.74a; emphasis added].
N.J.S.A. 17:22-6.74b(5) provides that the Fund may:
(5) With the approval of the commissioner, borrow monies from any source, including but not limited to the New Jersey Property-Liability Insurance Guaranty Association, in accordance with subsection b. of section 6 of P.L. 1984, c. 101 (C. 17:22-6.75), as may be necessary to effectuate the purposes of that act, except that the use of the proceeds of any loans shall be limited to the payment of covered claims, including claim adjustment expenses. [Emphasis added].
The authority for the Commissioner's May 29, 1985, order is the statutory provision that the "commissioner may adjust the fund's obligations for covered claims based on the monies available in the fund." N.J.S.A. 17:22-6.74a(1). See Estate of Carroll v. Samuel Geltman and Co., 214 N.J. Super. 306, 308 (App.Div. 1986), certif. den. 107 N.J. 151 (1987). The Fund's ability to pay its obligations is controlled by the Commissioner as the Fund may only borrow money "[w]ith the approval of the commissioner." N.J.S.A. 17:22-6.74b(5).
The Fund's basic statutory means of obtaining money are limited. Each member insurer is required to make a one-time payment of $25,000 and is then proportionately assessed an annual surcharge on its policy premium revenues not to exceed 4% of the member's net direct written premiums for the calendar year preceding the assessment. N.J.S.A. 17:22-6.75a(1) and (2). Contrary to plaintiffs' assertion, the statute provides no mechanism by which the Fund can obtain monies in excess of the 4% limitation from the member insurers even if needed. N.J.S.A. 17:22-6.75a(2).
With respect to loans from the Association, the Fund is limited by N.J.S.A. 17:22-6.75b which provides:
The fund may, from time to time, borrow monies from the New Jersey Property-Liability Insurance Guaranty Association to pay the fund's obligations and expenses under this act, which are in excess of the monies available to the fund therefor. The aggregate amount owed by the fund to the association shall at no time exceed $10,000,000.00, exclusive of interest charges, except that the commissioner may limit the amount of loans outstanding at any one time to less than $10,000,000.00 upon a finding that the additional monies requested by the fund would reduce the monies available to the *139 association below a level necessary to meet the current and prospective obligations of the association pursuant to paragraph (3) of subsection a. of section 8 of P.L. 1974 (C. 17:30A-8). Monies borrowed under this subsection shall be paid back to the association in accordance with a payment schedule approved by the commissioner. An interest charge shall be levied on all monies borrowed under this subsection at the current market rate of interest, using an index or indexes to be selected by the commissioner. [Emphasis added].
The Fund may borrow from other sources, but such loans must be approved by the Commissioner. N.J.S.A. 17:22-6.74b(5).
We have no doubt that in many cases Ambassador policyholders are suffering serious financial consequences because of the Commissioner's order limiting the payment of claims to 40%. Plaintiffs in Estate of Carroll had recovered judgments in a personal injury action against Ambassador's insureds, and we held that the tortfeasor should "bear the burden of the fund's delay and the risk that it will never pay in full." 214 N.J. Super. at 308-09. However, it is also beyond question that injured claimants are denied their just compensation where the Ambassador insured is unable to respond personally in damages. These were the precise hardships the Legislature hoped to alleviate when it enacted the Surplus Lines Insurance Guaranty Fund Act. Clearly the remedy which the Legislature sought after is not being fully provided; however, that does not necessarily compel judicial intervention.
There is presently a shortfall of over 30 million dollars in funds needed just to cover the present and reasonably anticipated future Ambassador claims. The Legislature can, if it desires, make available additional monies for the Fund. The Legislature has designated the Commissioner as its agent to make the day-to-day policy decisions required within the frame-work of the present funding scheme. If the present system of funding is inadequate, or if the Commissioner is too restrictive in the control of borrowing under the present statute, we see no compelling reasons for judicial intervention. The Legislature has the ability to provide greater direction to the Commissioner in the task of securing additional funds within the limitations of the Act or it can restrict the discretion which the Commissioner *140 presently has. The matter is clearly one of legislative concern and that branch of government has it fully within its ability to provide the relief necessary to carry out the original purposes of its enactment. "If the statute works inequitably, it is up to the Legislature to correct the difficulty." Matawan Borough v. Monmouth Cty. Tax Bd., 51 N.J. 291, 298 (1968); Lind v. Insurance Co. of North America, 174 N.J. Super. 363, 369 (Law Div. 1980), aff'd 193 N.J. Super. 303 (App.Div. 1983). The relief sought requires the exercise of political and business judgments which this court may not usurp from the elected representatives of the people.
Plaintiffs maintain that the Commissioner's failure to pay the balance of the covered claims constitutes inaction with respect to mandated ministerial acts in light of the statutory duty imposed on the Fund to pay such claims. A duty is "ministerial" when
it is absolutely certain and imperative, involving merely the execution of a set task, and when the law which imposes it prescribes and defines the time, mode and occasion of its performance with such certainty that nothing remains for judgment or discretion. [Case v. Daniel C. McGuire, Inc., 53 N.J. Super. 494, 498 (Ch.Div. 1959)].
The statutory grant of power to the Commissioner to "adjust the fund's obligations for covered claims based on the monies available in the fund," N.J.S.A. 17:22-6.74a(1), entails judgment and discretion. The obligation to pay fully covered claims cannot be considered a ministerial act inasmuch as the claims cannot be paid unless in the Commissioner's judgment the needed monies can be borrowed from the Association or other sources without violating the constraints set forth in the Act. N.J.S.A. 17:22-6.75a and b; N.J.S.A. 17:22-6.74b. The Law Division was without jurisdiction to compel payment under the Act as such relief involved more than mandating the performance of a ministerial obligation. Equitable Life Mort. v. N.J. Div. of Taxation, 151 N.J. Super. 232, 238 (App.Div.), certif. den. 75 N.J. 535 (1977); see also Pfleger v. N.J. State Highway *141 Dept., 104 N.J. Super. 289, 291-93 (App.Div. 1968); Colon v. Tedesco, 125 N.J. Super. 446, 449-52 (Law Div. 1973).
R. 2:2-3(a)(2) requires that appeals "be taken to the Appellate Division ... to review final decisions or actions of any state administrative agency or officer, and to review the validity of any rule promulgated by such agency or officer...." See Pascucci v. Vagott, 71 N.J. 40, 51-54 (1976). The trial court correctly determined that jurisdiction belonged in this court but it should have transferred the matter to us rather than dismissing the complaint. See R. 1:13-4(a).
In any event, we are convinced that the relief sought can be adequately provided by the Legislature and that judicial intervention is inappropriate. We accordingly dismiss the appeal.
NOTES
[1] The preexisting New Jersey Property-Liability Guaranty Association Act, N.J.S.A. 17:30A-1 et seq., did not cover surplus lines insurers. Railroad Roofing, etc., Co. v. Financial Fire & Cas. Co., 85 N.J. 384, 392-93 (1981); Werner Indus. v. First State Ins., 217 N.J. Super. 436, 440 (App.Div. 1987).