ALVAREZ, P.J.A.D.
*365 Plaintiff New Gold Equities Corporation (New Gold) appeals from a June 5, 2015 judgment entered in favor of defendant/cross-appellant M & T Bank (the Bank), an indenture trustee, in its negligence action concerning a $2,100,000 bond. We affirm the trial judge's decision entering judgment for the Bank, in part, because the duties of the indenture trustee were properly limited to those enumerated in the trust agreement. We also affirm the judge's post-judgment August 25, 2015 order denying the Bank's application for $360,335.85 in attorney fees and $45,707.56 in costs. The indenture agreement did not obligate New Gold to reimburse the bank for the legal expenses it incurred defending against its own negligence.
New Gold acquired the property in 1990 from Old Gold Associates (Old Gold),[1] which had purchased it on December 22, 1982, *366 from defendant Jaffe Spindler Company, LLC (Jaffe). The transaction was financed through a thirty-year commercial bond agreement, secured by a mortgage against the property, issued by the New Jersey Economic Development Authority (NJEDA).
The yearly interest rate on the bond was fixed at 13%. New Gold was required to actually pay, however, monthly interest ranging at a reduced 6.29% to 7.62%. The difference between the base rate and the monthly interest, described in the loan documents as "deferred interest," accrued but was not due if the principal balance was paid at any time during the first eleven months of the last year of the loan-between December 23, 2011, and November 22, 2012.
In other words, New Gold would not have to pay $3,714,864 in accrued but deferred interest if the principal was satisfied on or before November 22, 2012.[2] New Gold did not exercise this option, thus the bond's principal balance of $2,100,000 together with the deferred interest all became *1055 due at the loan maturity date on December 22, 2012.
In 2010, the Bank became the indenture trustee, assuming the role from a series of predecessor entities. Marco Medina, a Bank employee, administered the bond from 2010 to the maturity date.
New Gold employed BLDG Management Company, Inc. (BLDG), as the property manager. Senen Bacalan was the BLDG employee responsible for the administrative tasks relative to the mortgage.
On November 12, 2012, forty days before maturity and ten days before the prepayment option expired, Bacalan sent an email to Medina requesting a payoff figure at the maturity date, December 22, 2012: the "usual status letter indicating the principal balance and per diem interest." Medina, who was entirely unaware of the *367 deferred interest provision, did not respond until November 27, 2012, fifteen days later. He forwarded a payoff statement that read: "[t]his letter will serve as notice that on December 22, 2012, the [bond] issued in the amount of $2,100,000 shall be due and payable. Also due at this time is interest in the amount of $13,334."
After Bacalan pointed out that the payoff figures did not include a smaller subordinate bond, Medina sent Bacalan a corrected payoff reflecting an accurate total principal balance due of $2,330,000. Bacalan identified another error in that second payoff statement, the omission of the interest that had accrued on the subordinate bond. On December 18, 2012, Medina responded with a third corrected payoff, stating that an additional $16,017.34 in interest was due.
While preparing the payoff statements prior to the December 22, 2012 maturity date, Medina did not review the bond documents. Thus none of the payoff statements included any mention of the additional deferred interest.
On December 19, New Gold paid the December 18, 2012 payoff statement amounts. After the payment, Medina learned about the deferred interest clause, reviewed the terms of the bond for the first time, and notified New Gold of the additional interest due.
Bacalan, who was also unaware of the deferred interest clause, had inherited handwritten notes and calculations regarding the bond obligation from his predecessor, Patrick Knowles. Knowles, who began working at BLDG in 1990 and retired in 2011, had written "deferred int. $1,000,827.46" on a page of the mortgage schedule. Bacalan, although he had those materials, had never asked anyone about the notations, nor had he read the actual bond documents.
On February 13, 2013, Jaffe sent NJEDA a letter demanding payment of the $3,714,864 deferred interest and threatening to foreclose on the mortgage if it was not made. A parallel foreclosure proceeding was thereafter filed by Jaffe.
*368 The indenture agreement entered into between Jaffe, New Gold's predecessor in interest Old Gold, and the NJEDA, states that the Bank's predecessor is appointed a trustee so as to "receiv[e] and apply[ ] all payments ... as hereinafter provided." The Bank's duties were expressly limited to
Section 6.[3] Duties of Trustee with Respect to Bond Agreement.
A. The Trustee agrees to receive all payments and deposits required to be paid under the Authority Agreement and to make all payments required to be made under the Bond and Mortgage (or *1056 under the Authority Agreement in the event the same is assigned to the holder of the Bond and Mortgage pursuant to the terms of Section "4.06" of the Bond Agreement) as follows:
i) make payments to the holder of the Existing Mortgage, or withhold such payments upon receipt of reasonable evidence that such payments have been made;
ii) pay taxes and insurance premiums;
iii) transmit the net amount due to the holder of the Mortgage and the obligee of the Bond. The holder of the Mortgage and the obligee of the Bond shall have the right to demand that the Trustee, after making payment on the Existing Mortgage, or underlying obligation thereof, remit the balance due to the obligee of the Bond by more than one (1) check and the mailing of the same to more than one (1) individual; and in which event, after notice thereof to the mortgagor, separate payments and mailings shall be made to the various participating holders and obligees according to their respective interests, as contained in the notice thereof to said mortgagor; and
iv) make prepayments only when directed by the Seller.
B. Any payments made to the Trustee on account of real estate taxes shall be held in escrow in an interest-bearing account, if permissible. The deposit shall be applied to the taxes due for the then current fiscal tax year with any overpayment or underpayment to be adjusted within sixty (60) days of the end of such period. The requirements for this deposit shall be waived for three (3) months for each quarterly tax payment theretofore made directly by the obligor required to pay such taxes provided that evidence of the payment is furnished to the holder of the Mortgage and the Trustee. In the alternative, the obligor required to pay such taxes may require the Trustee to prepay taxes out of excess tax escrow funds, if any, on deposit with the Trustee;
C. Any payments made to the Trustee on account of insurance premiums shall be held, in escrow in an interest-bearing account, if permissible, and shall be applied to the payment of such premiums. The requirement for this deposit shall not apply in any year in which the holder of the Mortgage shall be furnished with a prepaid policy for such year;
*369 D. The Trustee may rely on all certificates, documents and other proofs delivered to it by [Old Gold] pursuant to this Agreement as to the facts therein disclosed and the statements therein made.
[Old Gold] hereby acknowledges that it is familiar with all the duties of the Trustee and agrees not to interfere with the Trustee's exercise of its duties. [Old Gold] further agrees that the Trustee, the Seller and their respective employees shall not be liable for, and agrees to hold the Trustee, the Seller and their respective employees harmless against any loss or damage suffered by the Company as a result of the Trustee's good faith performance hereunder, except loss or damage resulting from the negligence or willfull misconduct of the Trustee or its employees.
E. At the direction of [Old Gold], the real estate taxes remain unpaid for the immediately preceding two consecutive quarters.
F. The Trustee agrees to make all payments required to be made promptly on receipt of funds; after said receipt of funds have been cleared and the Trustee has collected funds.
*1057 New Gold's complaint sought to cancel the mortgage securing the bond, alleging that the deferred interest was an illegal, unenforceable, and uncollectable disguised penalty. New Gold also sought judgment discharging the mortgages, liens, and encumbrances on the property, as well as damages. Jaffe counterclaimed in foreclosure and for possession.
Summary judgment motions and cross-motions were filed by the parties in both this action and Jaffe's separate foreclosure action. On August 28, 2013, among other relief, Judge Hector Velazquez granted Jaffe summary judgment in this case, and partial summary judgment in the parallel foreclosure proceeding. The judge concluded that as a matter of law the deferred interest provision was not a penalty because it was "simply due at maturity[.]" Jaffe Spindler Co., LLC v. New Jersey Econ. Dev. Off., No. A-5718-13 (App. Div. July 8, 2016) (slip op. at 4), 2016 WL 3636578, cert. denied, 228 N.J. 266, 156 A.3d 179 (2016).
On the appeal taken in the foreclosure proceeding, we affirmed the judge's grant of partial summary judgment to Jaffe despite the fact it issued prior to the completion of discovery. Id. at 3. We also affirmed the judge's holding that the deferred interest provision was not an illegal penalty. Ibid. Subsequent to that decision, *370 New Gold proceeded solely against the Bank in this litigation and Jaffe foreclosed on the property.
The judge denied summary judgment to the Bank because disputed issues of material fact existed as to whether the Bank had actually assumed a duty when it provided the payoff statement, or could be found negligent in the manner it responded. In order to prevail, then, New Gold would have to establish that the Bank was the proximate cause of the harm, defined as full payment of the deferred interest.
During the bench trial, both New Gold and the Bank presented expert witnesses as to whether an industry standard existed for response times to payoff requests made to indenture trustees. Bacalan also testified regarding his records, his knowledge of New Gold's financial obligations under the bond, and communications with Medina.
Relying upon federal law and out-of-state precedent, the judge reiterated his opinion first enunciated in the summary judgment decision, stating that the duties of the Bank as an indenture trustee were solely governed by the terms of the indenture, the trust agreement. The judge also found that responses to the payoff requests were not merely ministerial in nature. Rather, because the Bank "voluntarily or gratuitously" provided the payoff figures, it assumed the obligation and was thus required to perform the service in a reasonably careful manner.
The judge rejected New Gold's expert testimony to the effect that the industry standard required the Bank to provide a payoff figure within three days. Instead, he credited the Bank's expert, who testified that although the Bank had a responsibility to respond, there was no industry standard for the time frame in which to do so.
The judge opined that the acts of negligence committed by the Bank did not relate to the response time. The negligence occurred when Medina failed to review the trustee agreement, and failed to *371 maintain accurate records concerning the payments to be made under the bond.
The judge therefore concluded that New Gold had not proven proximate cause. The Bank could not have foreseen the harm to New Gold, nor did the Bank's negligence ultimately lead to New Gold's injury. Given Bacalan's wording of the request for a payoff, the Bank had the right to rely on *1058 New Gold's representations that it intended to pay the bond at maturity and not earlier. Since the Bank could not have foreseen that New Gold would not have known of the deferred interest, it was not the proximate cause of the harm. New Gold never blindly relied upon Medina's payoff responses, actually comparing them to its own records.
Ultimately, New Gold was negligent to an extent far greater than the Bank. If New Gold was unaware of the deferred interest provision, it was as a result of its own failure to review the bond documents and thereby become familiar with its rights and obligations. Hence, the judge held New Gold's contributory negligence was the primary cause of the harm.
Furthermore, New Gold's management company, BLDG, had prior knowledge of the prepayment and deferred interest provision, established through the scheduled payment records and Knowles's handwritten notations. BLDG failed to "create a system or methodology that would ensure the proper and timely exercise of the options." Thus, the court entered judgment for the Bank.
Two months after the trial, on August 25, 2015, Judge Velasquez denied the Bank's motion for $360,335.85 in counsel fees and $45,707.56 in costs:
The lack of an express provision obligating New Gold to indemnify [the Bank] against allegation of [the Bank's] own negligence means that the Central Motor [4] "default rule" applies and permits the court to supply the missing terms. Accordingly, *372 the [c]ourt finds that [the Bank] may not recover the defense costs incurred in this matter.
New Gold raises the following points on appeal:
POINT 1: THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT HELD IN ITS MAY 13, 2015 SUMMARY JUDGMENT ORDER THAT M & T BANK DID NOT HAVE AN EXPRESS OR IMPLIED DUTY TO PROVIDE NEW GOLD WITH A TIMELY AND ACCURATE RESPONSE TO ITS NOVEMBER 12, 2012 REQUEST FOR FACTUAL INFORMATION CONCERNING THE AMOUNT DUE AT MATURITY
POINT 2: THE TRIAL COURT ERRED IN DETERMINING THAT M & T BANK WAS NOT NEGLIGENT IN FAILING TO PROVIDE AN ACCURATE RESPONSE TO NEW GOLD'S REQUEST FOR INFORMATION PRIOR TO NOVEMBER 22, 2012
POINT 3: THE DOCTRINE OF COMPARATIVE NEGLIGENCE DOES NOT BAR RECOVERY BY NEW GOLD HERE BECAUSE M & T BANK WAS ACTING IN A PROFESSIONAL CAPACITY IN ADMINISTERING THE BOND AND NEW GOLD JUSTIFIABLY RELIED ON M & T BANK TO PROVIDE IT WITH TIMELY AND ACCURATE PAYOFF INFORMATION.
POINT 4: THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY BLINDLY ENFORCING THE BOND'S DEFERRED INTEREST PROVISION AND GRANTING SUMMARY JUDGMENT IN FAVOR OF JAFFE SPINDLER PRIOR TO THE CONCLUSION OF DISCOVERY.
I.
We review summary judgment orders de novo.
*1059 Arroyo v. Durling Realty, LLC, 433 N.J. Super. 238, 242, 78 A.3d 584 (App. Div. 2013) (citing Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 374, 997 A.2d 954 (2010) ). We ask first if, viewing the evidence in the light most favorable to the nonmoving party, genuine issues of material fact exist. Rowe v. Mazel Thirty, LLC, 209 N.J. 35, 41, 34 A.3d 1248 (2012) (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 529, 666 A.2d 146 (1995) ). If the evidence is so one-sided that one party will prevail as a matter of law, summary judgment should be granted. Brill, 142 N.J. at 523, 666 A.2d 146. The legal conclusions regarding the motion itself, however, are subject to plenary review. Estate of Hanges, 202 N.J. at 385, 997 A.2d 954.
The classic articulation of our role on appeal after a bench trial remains that found in *373 Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 483-84, 323 A.2d 495 (1974). The trial judge's factual findings are "binding on appeal when supported by adequate, substantial and credible evidence." Id. at 484, 323 A.2d 495 (citing N.J. Turnpike Auth. v. Sisselman, 106 N.J. Super. 358, 255 A.2d 810 (App. Div. 1969) ). Factual findings, along with the judge's legal conclusions, are reviewed deferentially and left undisturbed unless "manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice...." Ibid. This standard was recently reaffirmed by the Supreme Court. Allstate Ins. Co. v. Northfield Med. Ctr., 228 N.J. 596, 619, 159 A.3d 412 (2017).
II.
A.
New Gold contends that the calculation of a payoff figure was a ministerial task which required the Bank to exercise a duty of care. The indenture trust agreement in this case, however, did not obligate the Bank to provide payoff figures to New Gold. It only obligated the Bank to receive New Gold's payments and apply them towards the debt, hold funds in escrow when appropriate, and timely pay tax bills and insurance premiums.
The judge properly limited the Bank's duties to those expressed in the indenture agreement, a principle well-established outside New Jersey. In Meckel v. Cont'l Res. Co., 758 F.2d 811, 816 (2d Cir. 1985), the court explained, based on the Trust Indenture Act, 15 U.S.C. §§ 77aaa - 77bbb (1982), that the duties of an indenture trustee should be limited to those found in the indenture. Meckel discussed the doctrine in the context of an indenture trustee's mailing of notices of a time-sensitive conversion option. Id. at 813. The question was whether that indenture trustee had breached a duty of care by forwarding the notices by ordinary mail, as set forth in the indenture. Id. at 815. The court observed, "Trust indentures are important mechanisms for servicing corporate debt and banks play an essential role in the process that brings *374 corporate financings to the public market." Ibid. In recognition of that important role, Congress limited the indenture trustee's obligation to those within the agreement. Id. at 815-16. Furthermore,
an indenture trustee is not subject to the ordinary trustee's duty of undivided loyalty. Unlike the ordinary trustee, who has historic common-law duties imposed beyond those in the trust agreement, an indenture trustee is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement.
[ Id. at 816.]
Several federal courts, including the Third Circuit, have applied the rule found in Meckel. See, e.g., Peak Partners, LP v. Republic Bank, 191 Fed.Appx. 118, 122 (3d Cir. 2006) ;
*1060 In re Sunshine Jr. Stores, Inc., 456 F.3d 1291, 1309 (11th Cir. 2006) ; Shawmut Bank, N.A. v. Kress Assocs., 33 F.3d 1477, 1491 (9th Cir. 1994) ; Lorenz v. CSX Corp., 1 F.3d 1406, 1415 (3d Cir. 1993) ; Premier Bank v. Tierney, 114 F.Supp.2d 877, 881 (W.D. Mo. 2000) ; Vernon Johnson Family L.P. v. Bank One Tex., N.A., 80 F.Supp.2d 1127, 1134 n.7 (W.D. Wash. 2000) ; Harriet & Henderson Yarns, Inc. v. Castle, 75 F.Supp.2d 818, 830 (W.D. Tenn. 1999).
Although New Jersey has never expressly adopted the rule in Meckel, other states have. See, e.g., Dell'Oca v. Bank of N.Y. Tr. Co., 159 Cal.App.4th 531, 71 Cal.Rptr.3d 737, 743 (2008) ; Cent. Bank, N.A. v. Deloitte & Touche, 928 P.2d 754, 755 (Colo. App.) ; Nat'l City Bank v. Coopers & Lybrand, 409 N.W.2d 862, 866 (Minn. Ct. App.) ; AG Capital Funding Partners, L.P. v. State St. Bank & Tr. Co., 11 N.Y.3d 146, 866 N.Y.S.2d 578, 896 N.E.2d 61, 66 (2008).
At trial, New Gold did not dispute the rule enunciated in Meckel, and the federal cases and precedents following it from other jurisdictions. We see no reason, and New Gold offers none, to depart from that doctrine and the trial judge's conclusion. The role of an indenture trustee is unique in that it serves more than one master.
The Bank was accountable to others besides New Gold, specifically, Jaffe and NJEDA. The function of an indenture *375 trustee is defined by federal law and thus a primary source for the interpretation of such contracts should be federal precedent. There is no inherent unfairness to holding an indenture trustee and the affected parties to the express terms of the indenture agreement. We therefore affirm the judge's decision, made at summary judgment and expressly reiterated in his decision after trial, that the duties of an indenture trustee are limited to those found in the indenture agreement.
B.
New York and other foreign jurisdictions require an indenture trustee "to perform its ministerial functions with due care[.]" AG Capital, 866 N.Y.S.2d 578, 896 N.E.2d at 67 ; Commerce Bank v. Bank of N.Y. Mellon, 141 A.D.3d 413, 35 N.Y.S.3d 63, 65 (2016). Where "this duty is breached the trustee will be subjected to tort liability." AG Capital, 866 N.Y.S.2d 578, 896 N.E.2d at 67. The consequences of such liability are carefully circumscribed, however: "the alleged breach of such duty neither gives rise to fiduciary duties nor supports [breach of fiduciary duty claims]." Ibid.; Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.A.R.L., 47 Misc.3d 544, 996 N.Y.S.2d 476, 494 n.10 (2014) ("[A]lthough a trustee does not have pre-default fiduciary duties, it must perform its ministerial functions with due care."). New Gold claims the obligation to timely and accurately respond to its payoff request was included in the Bank's ministerial functions.
A duty is defined as "purely ministerial and administrative" if it "involve[s] the exercises of no discretion." N.Y. State Med. Care Facilities Fin. Agency v. Bank of Tokyo Tr. Co., 163 Misc.2d 551, 621 N.Y.S.2d 466, 468 (1994), aff'd, 216 A.D.2d 126, 629 N.Y.S.2d 3, appeal dismissed, 87 N.Y.2d 892, 640 N.Y.S.2d 873, 663 N.E.2d 914 (1995). Such "administrative chores with regard to [a] bond[ ]" include tasks like "notifying the principal when it receives actual written notice of relevant information in connection therewith," ibid., and delivering a registration statement required *376 by statute prior to an event of default, AG Capital, 866 N.Y.S.2d 578, 896 N.E.2d at 66.
New Jersey also defines ministerial duties as "so plain in point of law and so clear in matter of fact that no element of discretion is left as to the precise mode of *1061 their performance[.]" Switz v. Middletown, 23 N.J. 580, 588, 130 A.2d 15 (1957) (quoting Mooney v. Edwards, 51 N.J.L. 479, 17 A. 973 (Sup. Ct. 1889) ).
More recently, a ministerial duty has been described as "absolutely certain and imperative, involving merely the execution of a set task, and when the law which imposes it prescribes and defines the time, mode and occasion of its performance with such certainty that nothing remains for judgment or discretion." Caporusso v. N.J. Dep't of Health & Senior Servs., 434 N.J. Super. 88, 102, 82 A.3d 290 (App. Div. 2014) (quoting Ivy Hill Park Apartments v. N.J. Prop. Liab. Ins. Guar. Ass'n, 221 N.J. Super. 131, 140, 534 A.2d 35 (App. Div. 1987) ; Vas v. Roberts, 418 N.J. Super. 509, 522, 14 A.3d 766 (App. Div. 2011).
Making a payment of an amount that is fixed and not open to dispute has long been considered a ministerial task. Kelley v. Bd. of Chosen Freeholders, 118 N.J.L. 450, 453, 193 A. 553 (1937). Calculating the salary of a state employee was not a ministerial task where the employee's "right to the sum claimed [was] not so clear that there remain[ed] only the ministerial duty to pay it[ ]" and "involve[d] a construction of [a] statute." Kelley, 118 N.J.L. at 453-54, 193 A. 553.
In this case, however, the calculation of the payoff due at maturity was not so easily ascertained. The bond documents explain the payoff is subject to modification in the event of the occurrence of three circumstances: if Jaffe exercised its right to accelerate payment of the principal any time after the 204th monthly installment; if New Gold exercised its right to prepay the principal in the eleven-month period between when the 348th and 359th monthly installments were due; and upon the happening of one of four identified "Events of Default." Calculating New Gold's payoff obligation at maturity required looking outside the functions *377 spelled out in the bond documents and determining if any of the enumerated circumstances were present. It was more involved than the "administrative chores" of sending a notification conveying information received by the trustee, Bank of Tokyo Tr., 621 N.Y.S.2d at 468, or delivering a registration statement, AG Capital, 866 N.Y.S.2d 578, 896 N.E.2d at 66.
Thus, we conclude that the payoff calculation involved more than "merely the execution of a set task[ ]" that was defined "with such certainty that nothing remain[ed] for judgment or discretion." See Caporusso, 434 N.J. Super. at 102, 82 A.3d 290. It required the exercise of some discretion by the Bank in interpreting the terms of the bond. The Bank had to do more than "simple arithmetic[.]" See Cohen v. Board of Trustees of University of Medicine and Dentistry of New Jersey, 240 N.J. Super. 188, 201, 572 A.2d 1191 (1989). New Gold's payoff obligation at maturity was "not so clear that there remain[ed] only the ministerial duty to pay it[.]" Kelley, 118 N.J.L. at 454, 193 A. 553.
The preparation of the payoff statement was not a mere nondiscretionary ministerial function. It was not a duty found in the indenture agreement, or a ministerial function inherent in that document which required due care.
III.
New Gold also challenges the trial judge's decision that, despite the Bank's failure to provide complete payoff information, it could not be held liable since it was not the proximate cause of the harm. New Gold contends that the trial judge's conclusion that the Bank was not negligent in its response time was error.
A negligence claim requires a plaintiff to "establish four elements: (1) that the defendant owed a duty of care; (2)
*1062 that the defendant breached that duty; (3) actual and proximate causation; and (4) damages." Fernandes v. DAR Dev. Corp., 222 N.J. 390, 403-04, 119 A.3d 878 (2015) (citing Townsend v. Pierre, 221 N.J. 36, 51, 110 A.3d 52 (2015) ). "To act non-negligently is to take *378 reasonable precautions to prevent the occurrence of foreseeable harm to others." Id. at 404, 119 A.3d 878 (quoting Weinberg v. Dinger, 106 N.J. 469, 484, 524 A.2d 366 (1987) ).
In rendering judgment, the judge relied upon the Bank's expert, who testified that there was no standard industry rule or custom defining the proper time frame for a response to a pay-off request. The expert considered the response time to be a customer service issue. He opined that in the absence of language in the trust agreement or an industry standard, a three-day response was not required. No bright line rule was applicable to this situation.
A judge has the right to reject or accept the evidence of experts at his or her discretion. LaBracio Family P'ships v. 1239 Roosevelt Avenue, Inc., 340 N.J. Super. 155, 165, 773 A.2d 1209 (App. Div. 2001). Such evidentiary rulings are accorded deference, and subject to reversal only if abuse of discretion occurs. No such abuse of discretion has been established; none is apparent from the record.
Finding no industry standard existed, the judge asked only whether the Bank took the precautions a reasonably prudent person in that position would have taken. Fernandes, 222 N.J. at 403-04, 119 A.3d 878. This question is one of fact, which we review deferentially. Jerkins v. Anderson, 191 N.J. 285, 305, 922 A.2d 1279 (2007).
The record supports the trial court's conclusion that the response was timely in light of the nature of the request. No urgency was expressed in Bacalan's communications to Medina, and he requested the payoff forty days from the identified deadline. Thus, the trial court's finding that the Bank did not breach any duty by the timing of the response was not manifestly unsupported by or inconsistent with the competent, relevant, and reasonably credible evidence so as to offend the interests of justice. See Cesare v. Cesare, 154 N.J. 394, 412, 713 A.2d 390 (1998). The Bank, whose ministerial duties did not include providing *379 a response within three days, was not the proximate cause of the harm.
Proximate cause is "a basic element of tort law," yet "defies precise definition." Cruz-Mendez v. ISU/Ins. Servs. of S.F., 156 N.J. 556, 575, 722 A.2d 515 (1999). "Traditionally, proximate cause has been defined 'as being any cause which in the natural and continuous sequence, unbroken by an efficient intervening cause, produces the result complained of and without which the result would not have occurred.' " Conklin v. Hannoch Weisman, 145 N.J. 395, 418, 678 A.2d 1060 (1996) (quoting Fernandez v. Baruch, 96 N.J. Super. 125, 140, 232 A.2d 661 (App. Div. 1967), rev'd on other grounds, 52 N.J. 127, 244 A.2d 109 (1968) ). "Generally, the determination of proximate cause is an issue of fact for the [factfinder]." Cruz-Mendez, 156 N.J. at 576, 722 A.2d 515 (citing Scafidi v. Seiler, 119 N.J. 93, 101, 574 A.2d 398 (1990) ).
"Analysis of proximate cause requires an initial determination of cause-in-fact." Francis v. United Jersey Bank, 87 N.J. 15, 39, 432 A.2d 814 (1981). Cause-in-fact, or "but for" causation, "requires proof that the result complained of probably would not have occurred 'but for' the negligent conduct of the defendant." Conklin, 145 N.J. at 417, 678 A.2d 1060 (quoting Vuocolo v. Diamond Shamrock Chems. Co., 240 N.J. Super. 289, 295, 573 A.2d 196 (App. Div. 1990) ).
*1063 The plaintiff must show "that the defendant's act or omission was a necessary antecedent of the loss, i.e., that if the defendant had observed his or her duty of care, the loss would not have occurred." Francis, 87 N.J. at 39, 432 A.2d 814.
New Gold contends that the harm it suffered would not have occurred but for the Bank's inaccurate and delayed payoff figures. We reiterate that the trial judge did not err in concluding that the Bank had no fiduciary duty to New Gold, and was not negligent when the responses were made after the deadline for excusal of the deferred interest but before the final payment was due. As the judge put it, the Bank would not have known that but for its *380 untimely response, New Gold would have paid the principal balance before the due date and avoided payment of the deferred interest. Hence the manner the bank responded was not the "but for" cause of New Gold incurring the deferred interest obligations.
IV.
"A basic notion of [New Jersey] law is that, generally, a tortfeasor should be liable for only the harm she actually caused to the plaintiff." Komlodi v. Picciano, 217 N.J. 387, 411, 89 A.3d 1234 (2014) (citing Scafidi, 119 N.J. at 112-13, 574 A.2d 398 ). "In cases where a plaintiff is responsible, in whole or in part, for the harm or injury she suffers, the doctrine[ ] of comparative negligence ... may serve to absolve a defendant of liability or limit her damages." Ibid. Comparative negligence applies where, such as here, "the injured party's carelessness occurs before defendant's wrong has been committed or concurrently with it." Id. at 412, 89 A.3d 1234 (alteration in original) (quoting Ostrowski v. Azzara, 111 N.J. 429, 438, 545 A.2d 148 (1988) ).
The Comparative Negligence Act "is a legislative amelioration of the perceived harshness of the common-law doctrine of contributory negligence." Ostrowski, 111 N.J. at 436, 545 A.2d 148 (citing N.J.S.A. 2A:15-5.1 to -5.8). To this end, N.J.S.A. 2A:15-5.1 holds that contributory negligence does not act as a bar to recovery of damages in negligence suits "if such negligence was not greater than the negligence of the person against whom recovery is sought." Thus, "if the plaintiff's negligence is fifty-one percent and defendant's forty-nine percent, the plaintiff receives no recovery." Komlodi, 217 N.J. at 412, 89 A.3d 1234.
When apportioning liability under the Comparative Negligence Act, "the fact-finder should compare the fault of all parties whose negligence was a proximate cause of the plaintiff's injuries." LaBracio, 340 N.J. Super. at 164, 773 A.2d 1209 (citing Campione v. Soden, 150 N.J. 163, 177, 695 A.2d 1364 (1997) ). Then, "the trier of fact" must find "[t]he extent, in the form of a percentage, of *381 each party's negligence or fault[ ]" which "shall be based on 100% and the total of all percentages of negligence or fault of all the parties to a suit shall be 100%." N.J.S.A. 2A:15-5.2(a)(2). As always, "findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Crespo v. Crespo, 395 N.J. Super. 190, 193, 928 A.2d 833 (2007) (quoting Cesare, 154 N.J. at 411-12, 713 A.2d 390 ).
Here, Judge Velazquez found New Gold was barred from recovery because its negligence in failing to review the bond documents and become familiar with the prepayment option was "substantially greater than 50%" and "was the primary cause of its alleged damages." New Gold does not contest that it was negligent in failing to read and know the terms of its own bond; instead, it argues the effect of its negligence should be lessened because such a prepayment option "was extremely unusual,"
*1064 the bond documents "were maintained in a paper file," the BLDG employee that knew about the prepayment option retired fifteen months before maturity, and "Bacalan had no expertise in reading bond or mortgage documents and regularly relied on the payoff information provided to him by banks." Those reasons are unconvincing.
Additionally, New Gold cites no authority to support the conclusion that any of these excuses relieved it of its own ordinary duty as a sophisticated party to a commercial contract to read and know the terms of the contract, the bond documents. Cty. of Morris v. Fauver, 153 N.J. 80, 110, 707 A.2d 958 (1998) (noting the "presum[ption] that the parties to a contract know the terms of their agreement"); Sears Mortg. Corp. v. Rose, 134 N.J. 326, 348, 634 A.2d 74 (1993) ("[I]nsurance purchasers are expected to read their policies."); Peter W. Kero, Inc. v. Terminal Const. Corp., 6 N.J. 361, 368, 78 A.2d 814 (1951) (recognizing "the general rule that where a party affixes his signature to a written instrument, ... a conclusive presumption arises that he read, understood and assented to its terms"); Millbrook Tax Fund, Inc. v. P.L. Henry & Assocs., Inc., 344 N.J. Super. 49, 53, 779 A.2d 1120 (App. Div. 2001) ("[A] policyholder is obliged to read the policy he receives *382 and is bound by the clear terms thereof."); Young v. Prudential Ins. Co. of Am., 297 N.J. Super. 605, 619, 688 A.2d 1069 (App. Div. 1997) ("Failing to read a contract does not excuse performance unless fraud or misconduct by the other party prevented one from reading."). The excuses defy common sense.
In addition to New Gold's obligation to be familiar with documents involving millions of dollars, BLDG's own file should have red-flagged the option. Knowles, BLDG's chief financial officer in August 1990 when New Gold became an obligor on the bond, identified his handwriting at deposition on the bond payment schedules turned over to Bacalan. The notation he made said "deferred int." Bacalan acknowledged at trial that the schedules also contained actual calculations totaling the deferred interest obligation. Although he used the document every month to assist him in tracking payments that were due, he never asked anyone about the implications of the "deferred int." words, nor the deferred interest numbers.
New Gold asserts that because the Bank is a professional bond trustee, it must be held to be more than fifty percent liable for the harm that resulted from its lack of familiarity with the deferred interest terms. But a professional bond trustee has different responsibilities from an indenture trustee. An indenture trustee's duties are limited to those imposed by the trust agreement, and the duty to perform ministerial nondiscretionary tasks. The trust agreement did not impose the duty of providing a payoff statement, much less make any mention of the deferred interest provision. New Gold's own negligence was the primary cause of the harm, in excess of fifty percent.
V.
New Gold also contends that the relationship it had with the Bank was professional- and client-based, making the Comparative Negligence Act, N.J.S.A. 2A:15-5.1 to -5.8, inapplicable. New Gold reasons that since the Bank is a "professional bond administrator" hired by New Gold "to serve as the professional trustee for *383 the [b]ond, with primary responsibility for receiving and making all required payments owed under the bond," the Comparative Negligence Act should not apply.
In New Jersey, "professionals may not diminish their liability under the *1065 Comparative Negligence Act when the alleged negligence of the client relates to the task for which the professional was hired." Aden v. Fortsh, 169 N.J. 64, 78, 776 A.2d 792 (2001). Thus, generally, "the comparative fault defense will not apply in a plaintiff's suit alleging a professional's malpractice, at least in those cases in which the defendant argues that the plaintiff was at fault in failing to understand or to perform the task for which the professional was hired." Ibid. (quoting Brian E. Mahoney, New Jersey Comparative Fault and Liability Apportionment § 6:2-10 at 119 (2001) ).
However, New Gold's argument ignores that, in formulating this exception to the Comparative Negligence Act's bar to recovery, the Supreme Court "premised [it] on the heightened responsibilities of professionals in this State" in order to prevent "the fiduciary relationship between the professional and the client [from] be[ing] under-mined[.]" Aden, 169 N.J. at 78, 776 A.2d 792 (emphasis added). The Court recognized that "[a]ctions involving a breach of professional duty are not everyday negligence claims-they involve obligations arising from special relationships." Id. at 75, 776 A.2d 792. This special relationship arises "when the duty of the professional encompasses the protection of the client or patient from self-inflicted harm." Ibid. (quoting Conklin, 145 N.J. at 412, 678 A.2d 1060 ).
In Aden, which specifically addressed the liability of a negligent insurance broker under the Comparative Negligence Act, the Court held, "[i]n view of New Jersey's tradition of holding insurance professionals and other fiduciaries to higher standards, we conclude that [plaintiff's] failure to read the insurance policy cannot be asserted as comparative negligence in an action against the broker for negligent failure to procure insurance." Id. at 81-82, 776 A.2d 792 (emphasis added). It recognized that, "[t]o hold *384 that an insured must read the policy, and therefore is not entitled to rely on the broker's expertise" would be contrary to established case law and "would make the insured responsible for 'self-inflicted harm,' despite the broker's express obligation to protect the insured from that harm." Id. at 82, 776 A.2d 792.
New Gold cannot convincingly compare the relationship it had with the Bank, an indenture trustee, to the relationship between an insured and an insurance broker. An indenture trustee's "duties [are] defined, not by the fiduciary relationship, but exclusively by the terms of the agreement," AG Capital, 866 N.Y.S.2d 578, 896 N.E.2d at 66 (emphasis added) (quoting Hazzard v. Chase Nat'l Bank, 159 Misc. 57, 287 N.Y.S. 541, 570 (N.Y. Sup. Ct. 1936) ). The breach of any duty an indenture trustee does owe "neither gives rise to fiduciary duties nor supports" a breach of fiduciary duty claim, ibid. (alteration in original). In stark contrast, "[i]nsurance brokers stand in a fiduciary capacity with their clients, to whom they owe a duty to exercise reasonable skill and good faith." Harbor Commuter Serv., Inc. v. Frenkel & Co., 401 N.J. Super. 354, 367, 951 A.2d 198 (App. Div. 2008) (emphasis added) (citing Aden, 169 N.J. at 78-79, 776 A.2d 792 ).
Professional insurance brokers are hired and paid "to reduce, if not eliminate, the risk that an inadequate policy will be procured." Aden, 169 N.J. at 86, 776 A.2d 792. "It is the broker, not the insured, who is the expert and the client is entitled to rely on that professional's expertise in faithfully performing the very job he or she was hired to do." Id. at 69, 776 A.2d 792. As such, "the comparative negligence defense is unavailable to a professional insurance broker who asserts that the client failed to read the policy and failed to detect the broker's own negligence." Ibid.
*1066 The Bank, on the other hand, was only retained to receive and apply the payments made under the bonds, hold funds in escrow, and pay tax and insurance obligations, a necessary function as between Jaffe, NJEDA, and New Gold. It was not hired or paid to advise New Gold on the terms of the bond and keep track and notify New Gold of its opportunity to waive the deferred interest *385 under the prepayment option. It acted to the benefit of others besides New Gold. Unlike in Aden, there was no professional/client relationship between the Bank and New Gold. The comparative negligence defense is available to the Bank.
VI.
New Gold raises additional claims of error we do not address. We consider further discussion unnecessary because the arguments are made moot by this decision. N.J. Div. of Youth & Family Servs. v. A.P., 408 N.J. Super. 252, 261, 974 A.2d 466 (App. Div. 2009) ("An issue is 'moot' when the decision sought in a matter, when rendered, can have no practical effect on the existing controversy.").
VII.
The trial judge's decision denying the Bank's counsel fees was supported by the evidence and did not offend the interests of justice. We reach that conclusion after de novo review of the indenture agreement, a contract. Kieffer v. Best Buy, 205 N.J. 213, 222, 14 A.3d 737 (2011) (citation omitted). We "pay no special deference to the trial court's interpretation and look at the contract with fresh eyes." Id. at 223, 14 A.3d 737 (citation omitted).
"The objective in construing a contractual indemnity provision is the same as in construing any other part of a contract-it is to determine the intent of the parties." Ibid. (citing Mantilla v. NC Mall Assocs., 167 N.J. 262, 272, 770 A.2d 1144 (2001) ). "The judicial task is simply interpretative; it is not to rewrite a contract for the parties better than or different from the one they wrote for themselves." Ibid. (citation omitted).
We "give contractual terms 'their plain and ordinary meaning,' unless specialized language is used peculiar to a particular trade, profession, or industry." Ibid. (quoting M.J. Paquet, Inc. v. N.J. Dep't of Transp., 171 N.J. 378, 396, 794 A.2d 141 (2002) ).
*386 "If an indemnity provision is unambiguous, then the words presumably will reflect the parties' expectations." Ibid. (citation omitted). However, if an "an indemnity provision is ambiguous, the provision is 'strictly construed against the indemnitee.' " Ibid. (quoting Mantilla, 167 N.J. at 272, 770 A.2d 1144 ).
Under Section 8 of the trust agreement, New Gold indemnified the Bank "from and against, any and all claims, damages, demands, expenses, liabilities and losses of every kind, character and nature asserted by or on behalf of any person, firm, corporation or governmental authority arising out of, resulting from, or in any way connected with ... [the] financing or sale of the Project."[5] There is no explicit provision, however, that indemnifies the Bank from costs in actions concerning its own negligence. In fact, under Section 6(D) of the trust agreement, the Bank cannot "be liable for" and would be held "harmless against any loss or damage suffered by [New Gold] as a result of [the Bank's] good faith performance hereunder, except loss or damage resulting from negligence or willful misconduct of [the Bank]."
*1067 The Supreme Court has addressed the issue of "whether an indemnitee is entitled to indemnification for legal defense costs associated with defending against its own negligence." Id. at 270, 770 A.2d 1144. The Court called the common law principle "that an indemnitee who has defended against allegations of its independent fault may not recover its costs[ ]" the "'default rule' that parties to a contract may choose to override contractually by expressing such an intention in unequivocal terms." Id. at 272, 770 A.2d 1144. When:
the [parties'] contract failed to express in unequivocal terms that [the indemnitor] would indemnify [the indemnitee] for legal expenses incurred in defending itself against claims of its own negligence, we conclude that [the indemnitor] cannot be held responsible for those costs. That result follows because the [parties'] contract does not expressly state that [the indemnitor] will indemnify [the indemnitee] for the costs of defending against claims of [the indemnitee's] negligence. Therefore, *387 the Central Motor default rule applies and fills the gap that the parties left open in their contract.
[ Id. at 273, 770 A.2d 1144.]
The Supreme Court also adopted the " 'after-the-fact' " approach articulated in Central Motor. Ibid. (citing Central Motor, 251 N.J. Super. at 11, 596 A.2d 759 ). "[O]nce it is determined ... that an indemnitee has defended against alleged ... charges of its independent fault, the indemnitor is not liable for indemnification for those costs." Central Motor, 251 N.J. Super. at 12, 596 A.2d 759 (emphasis added). In other words, "[c]osts incurred by [an indemnitee] in defense of its own active negligence ... are not recoverable." Id. at 11, 596 A.2d 759 (citing Hanover Ltd. v. Cessna Aircraft Co., 758 P.2d 443, 448 (Utah Ct. App. 1988) ).
In determining whether an action alleges "active wrongdoing," the "[a]llegations in the pleadings may be a starting point ..., but the actual facts developed during trial should control." Ibid. (citation omitted). "Evidence which supports only a finding of passive negligence ... is insufficient to establish 'active wrongdoing.' " Ibid. (citing Piedmont Equip. Co. v. Eberhard Mfg. Co., 99 Nev. 523, 665 P.2d 256, 259 (1983) ). Passive negligence arises when the indemnitee "is found only derivatively or vicariously liable." Ibid. (citing Hanover, 758 P.2d at 448 ).
The trial court correctly applied the "default rule." The allegations against the Bank in the complaint and the facts developed at trial concerned only the Bank's own active negligence; there were no allegations or findings that [the Bank] was "only derivatively or vicariously liable." Central Motor, 251 N.J. Super. at 11, 596 A.2d 759 (citing Hanover, 758 P.2d at 448 ). Thus, the trial court also applied the correct standard. "[A]ll of New Gold's claims against [the Bank] were solely based upon allegations of [the Bank]'s own negligence[,]" and thus in the absence of language to the contrary, New Gold is not liable for the Bank's legal expenses and costs.
Affirmed.

Defendant 111 First Street Associates initially agreed to purchase the property on June 17, 1981. Days later, the agreement was assigned to Old Gold. We assume that the complaint was never served upon 111 First Street Associates and the matter dismissed as to that defendant.

Additional conditions are described later in this opinion.

We specifically discuss Section 8 of the indenture agreement in the section of the opinion addressing the Bank's claim for counsel fees.

Central Motor Parts Corp. v. E.I. duPont deNemours & Co., 251 N.J. Super. 5, 10, 596 A.2d 759 (App. Div. 1991).

The "Project" is defined as "financing the acquisition of land and buildings to be used as a factory building located in Jersey City." That this action falls within that scope is not disputed on appeal.