JULIA BECK ET AL., APPELLANTS, v. WALKER D. HINES, DIRECTOR GENERAL OF RAILROADS, RESPONDENT.

Argued June 16, 1920—Decided November 15, 1920.

Plaintiff was a passenger on a ferry-boat, when the wash from the transport "Great Northern," proceeding at more than normal speed, struck the deck where the plaintiff was standing, causing a commotion among the passengers, in which plaintiff was injured. There was contradictory testimony as to the distance between the ferry-boat and the transport, and also contradictory testimony as to how near a ferry might approach with safety under such circumstances. *Held*, that the question practically at issue was whether the captain of the ferry-boat, presumably educated and experienced in the speed of vessels, the depth and nature of the harbor, and the general dangers incident to river navigation, in variant circumstances, could have observed the transport sufficiently distant to realize the dangers of the situation, and thereby keep his passengers, to whom as the agent of a common carrier, he owed a high degree of care, out of a conceded danger zone; and *held*, further, that the question of whether the captain exercised, in the first instance, the necessary foresight of the ordinary prudent man, who, observing the probability of impending danger from adopting a certain course of action, did all that such a man could have reasonably done to avoid the danger, was a jury question.

On appeal from the Union County Circuit Court.

For the appellants, *Jeremiah A. Kiernan.*

For the respondent, *Devoe Tomlinson.*

The opinion of the court was delivered by

MINTURN, J. When the New Jersey Central ferry-boat "Wilkesbarre" was leaving her slip about two P. M. on the 19th of March, 1919, at Jersey City, with a complement of passengers, upon their way to the city of New York, the United States transport "Great Northern" was at the battery on her course up the centre of the Hudson river. The pilot of the ferry-boat saw the transport at the battery shortly after

the former left the slip, but he proceeded upon his course across the river under slow speed until the transport had passed him. The approach of the transport, whose passengers were made up of returning soldiers, resulted in inducing many of the passengers on the ferry-boat to leave the cabins, and take their stand upon the forward deck of the ferry-boat. While they were occupying that position of observation, one or more large waves or wash from the transport's speedy course, dashed with great force over the lower deck of the ferry-boat, flooding the same and causing a general retreat of the passengers to the cabins, injuring some, and wetting all who were not able to retreat in time to avoid the waves. Among the latter was this plaintiff, Mrs. Beck, who in her effort to escape the swell and wash of water on the deck, fell, was trodden upon by others in their endeavors to escape, and was injured, to recover damage for which injuries she instituted this suit.

The learned trial court directed a verdict for the defendant upon the ground that no evidence of negligence upon the part of the defendant was shown, and hence this appeal.

The plaintiff testified that the second wave over the deck caused the floor to be so slippery that her feet slipped and she fell with great force to the deck.

She further testified: "Two or three different times I tried to get up, but every time I tried to get up somebody would walk on me. Everybody tried to make for the same door." The water she says came up to her waist and that the ferry-boat at the time was about sixty or seventy feet from the transport, so that plaintiff "could clearly make out the faces of the different soldiers standing along the rails, and hear the different messages they were shouting out."

The transport was proceeding at a rate of fifteen or twenty miles an hour; the normal speed in such a situation was between eight and ten miles an hour. The centre of the river is its most shallow section, and the result was that her great speed in this shallow depth caused the waves to swell over to both shores. The "Wilkesbarre" was caused to "bob around like a cork." Two of the waves went over the bows of the

"Bound Brook," a sister ferry-boat, half a mile away; and also went over the bows of the Lackawanna ferry-boat "Scandinavia" three hundred feet away. The "Plainfield," then lying in the New York ferry-slip of defendant, was "bounced around like a cork." The "Red Bank" of the same line was so tossed about in the Jersey slip that the passengers and vehicles were detained on the boat until the waters had subsided. The "Washington" of the Pennsylvania line was so violently tossed about that her captain declared on the stand, "I have never seen a boat jump so since I have been in the business."

This statement of the general situation is given to evince the fact that the situation was abnormal, and that the effect of it was not overstated by the plaintiff in her narration of the scene upon the "Wilkesbarre." The testimony varied as to the distance the "Wilkesbarre" was from the transport at the time, some witnesses placing it as far as eight hundred feet away, while the porter of the "Wilkesbarre" placed the distance at eighty or ninety feet.

The testimony of one pilot of the Central railroad was to the effect that the ferry-boat might be safe two hundred and fifty feet away, but that she would be in dangerous waters when one hundred feet away. One pilot testified that he would not want to be within ninety feet of the transport with a ferry-boat at the rate of speed the transport was making; and when asked why, he stated, "His suction would drew me right into him. Nothing could stop it." Another testified: "Any boat that would be within one hundred feet or one hundred and fifty feet of the "Great Northern" at that time would not have survived. She would have been drawn into the suction, and been sunk and crushed right there." Another captain stated that the customary distance for a ferry-boat to observe in order to keep away from the "Great Northern" at the time, was between two hundred and fifty and three hundred feet. There was other testimony of a similar nature, tending to show the imminent danger incident to a too close approach of the two vessels.

The gravamen of the complaint was negligence in operation, and the insistence of the appellant is that the trial court erroneously took that question of fact from the jury. We can observe no contributory negligence *per se* in the case which would warrant a nonsuit, and the only question therefore presented is, whether the conduct of the defendant's agent, under the circumstances, was so palpably free from negligence that the court could legally classify it as a court question.

The question practically at issue was whether the captain, presumably educated and experienced in the speed of vessels, the depth and nature of the harbor, and the general dangers incident to river navigation, in variant circumstances, could have observed the transport sufficiently distant to realize the dangers of the situation, and thereby keep his passengers (to whom as the agent of a common carrier he owed a high degree of care) out of a conceded danger zone. If this opportunity of observation was presented to him, and he failed to take due care under the circumstances, the consequent liability of the master for such negligent act of its servant upon familiar rules is the obvious result.

The rule of tort-feasance in such a situation is not based upon the inquiry whether the tort-feasor did all in his power to obviate the accident after his want of care and foresight had become the dominant factor in superinducing the danger; but whether he exercised, in the first instance, the necessary foresight of the ordinary prudent man, who observing the probability of impending danger from adopting a certain course of action, does all that such a man could have reasonably done to avoid enmeshing himself and those entrusted to his care, in the dangerous environment that confronted him, and thus creating the proximate cause or the *causa sine quâ non,* which superinduced the accident.

We have declared, on more than one occasion, that the rationale of the rule of due care is the reasonable exercise of

"the foresight for harm." *Soriero* v. *P. R. R.,* 86 *N. J. L.* 642; *Higgins* v. *Goerke Co.,* 91 *Id.* 464; affirmed in this court, 92 *Id.* 424; *Kingsley* v. *D., L. & W. R. R.,* 81 *Id.* 536; *Munroe* v. *P. R. R.,* 85 *Id.* 688.

In the latter case where the plaintiff, who was standing a few feet from the edge of a railroad platform, was suddenly swept from his feet and killed by the suction of a passing train, we declared, "The test of generic duty imposed by law upon the defendant, under such circumstances, was to exercise reasonable foresight for harm." Nor is it necessary that he should have been able to foresee the particular danger which resulted; it is enough if an ordinarily prudent person should be able to foresee dangers or harm of some sort ahead. *Hill* v. *Winsor,* 118 *Mass.* 231.

The cases referred to are also authority for the proposition that where the issue is whether such care was exercised, the question becomes one for the jury and not for the court. A legal rule also not inapplicable to the situation is that involved in the maxim, *res ipsa loquitur,* which involves the inquiry whether in the presence of danger resulting from abnormal conduct or operation, the defendant exercised due care to prevent the occurrence. Ordinarily such accidents as that *sub judice* do not occur from normal operation; and when they do occur under alleged normality, the *onus probandi* is shifted to the defendant to show that the damage resulted through no lack of due care on his part, which inquiry necessarily becomes a jury question.

The rule thus applicable in such a situation as stated in *Higgins* v. *Goerke Co., ubi supra,* "raises a presumption of negligence, which it is incumbent on the defendant to rebut by an explanation tending to relieve it of the presumption of absence of any or all care; and in the absence of an explanation comporting with the exercise of due care and foresight for harm, a case of *prima facie* negligence is established."

To the same effect is *McKenzie* v. *Oakley,* 94 *N. J. L.* 66.

For these reasons the judgment under review should be reversed to the end that a *venire de novo* issue.

*For affirmance*—BLACK, WILLIAMS, GARDNER, JJ.   3.

*For reversal*—THE CHIEF JUSTICE, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, KATZENBACH, WHITE, TAYLOR, ACKERSON, JJ.   11.