**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0160-22

FARMERS INSURANCE
COMPANY OF FLEMINGTON
a/s/o AURORA RISTORANTE
INC., d/b/a ART OF SPICE,

      Plaintiff-Appellant,

v.

MIXTLI, LLC,

      Defendant,

and

BUY & SAVE
FURNITURE STORE,

      Defendant-Respondent.

_____

HANOVER INSURANCE COMPANY
a/s/o KETER REALTY, LLC, and
AIX SPECIALTY INSURANCE
COMPANY a/s/o KIDS RULE
PARTIES, INC.,

      Plaintiffs,

v.

MIXTLI, LLC,

      Defendant,

and

BUY & SAVE FURNITURE II,
CORP.,

      Defendant-Respondent.

_____

MIXTLI, LLC, by its subrogee
STATE FARM FIRE AND
CASUALTY COMPANY,

      Plaintiff,

v.

BUY & SAVE FURNITURE II,
CORP.,

      Defendant-Respondent.

_____

Submitted February 13, 2024 – Decided April 26, 2024

Before Judges Gooden Brown and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County Docket Nos. L-5663-19, L-2415-20, and L-4588-20.

Biancamano & Di Stefano PC, attorneys for appellant (J. Elliot Stolz, on the briefs).

2

A-0160-22

Gold, Albanese & Barletti, LLC, attorneys for respondent (Randall Scott Bruckman, on the brief).

PER CURIAM

Plaintiff Farmers Insurance Company of Flemington (Farmers), a/s/o Aurora Ristorante, Inc., d/b/a Art of Spice, appeals from the Law Division's order granting summary judgment to defendant Buy & Save Furniture II Corp., (B&S) and dismissing its subrogation action. That lawsuit arose from a large fire which occurred on October 24, 2018 on the first floor of a building owned by Mixtli, LLC, (Mixtli) at 153-155 Main Street in Hackensack where B&S was a tenant. The fire and associated collapse of the building caused damage to a building under construction located at 147-149 Main Street, owned by Keter Realty, and a building at 157-159 Main Street, where Art of Spice, Kids Rule Parties, Inc., and Battleground were tenants.[1]

Before the trial court, Farmers contended B&S was responsible for the fire and resulting damage based on two separate, but related theories. First, it argued

---

[1] The losses associated with the October 2018 fire spawned three subrogation matters that the court consolidated: (1) Farmers against Mixtli and B&S; (2) Hanover Insurance Company a/s/o Keter Realty and AIX Specialty Insurance Company a/s/o Kids Rule Parties versus Mixtli and B&S; and (3) State Farm Fire and Casualty Company a/s/o Mixtli against B&S. B&S also brought cross-claims against Mixtli for indemnification and contribution, which the court dismissed. This appeal relates only to Farmers' action against B&S.

A-0160-22

B&S was negligent because it stored furniture and other flammable materials, which the local fire department described as a "heavy fire load," on the first floor of the building where the fire originated, a location that did not contain sprinklers or any fire containment systems, contrary to the fire department's recommendation years earlier. Second, they argued B&S was liable for its insured's losses because one of its employees negligently delayed in reporting the fire to local authorities. Because we are convinced the summary judgment record established a genuine and material factual question with respect to Farmers' contention B&S was negligent by storing furniture and related material in an area without a fire suppression system, we reverse the court's order granting summary judgment on that theory, but affirm as to the court's conclusion that B&S was not liable based on its employee's purported failure to report the fire in a timely manner.

I.

We begin by reviewing the facts in the summary judgment record, viewing them in the light most favorable to Farmers as the non-moving party. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

In November 2013, B&S entered a lease with Mixtli for the basement and first floor of 153-155 Main Street, a building consisting of three floors in

4

addition to the basement. B&S used the first floor as its furniture showroom and the basement for storage; the second and third floors were "vacant [and in a] state of deterioration." As B&S manager Tareq Badran testified, the first floor was "an open room full of furniture" which had "everything," including chairs, sofas, and bedroom furniture.

The Hackensack Fire Department (HFD) inspected the building four times in 2014 and issued six fire code violations, requiring Mixtli and/or B&S to install a monitored alarm system in the basement and "highly recommend[ing]" installation of sprinklers and monitored alarms on the first floor. HFD also cited B&S for improperly storing items closer than two feet to the ceiling in the basement and first floor, and for storage on the second floor, which was "not approved as a storage area" and lacked a certificate of occupancy. At his deposition, Mixtli's owner, Agustin Gomez, also confirmed he was aware of a violation issued to B&S for storing mattresses on the second floor in 2017 or early 2018. He stated he saw mattresses and "more stuff" on the second floor "a couple of times" after that, which B&S removed upon his request.

Ultimately, all the violations were cleared, and it is undisputed there were no outstanding violations on the date of the fire. The parties also agree that on

A-0160-22

the date of the fire, the first floor of 153-155 Main Street where the fire began was equipped only with non-monitored smoke detectors.

HFD records reflected as of October 7, 2015, 153-155 Main Street had a "[h]eavy fire load" on the first floor. HFD Deputy Chief Christopher Annunziata testified at his deposition the "heavy fire load" classification is "designed to give the responding fire[fighters] a heads-up of anything out of the ordinary they would be responding to," and "any furniture store is going to have a heavy fire load." He explained based on his past visits to B&S, the fuel for a potential fire in that specific store included "a lot of furniture, a lot of cardboard, and a lot of plastics." He also noted B&S had "display lamps on tables near furniture that may have had extension cords powering them" and further, when considering the flammability of items in a furniture store, "there[ are] a lot of petroleum products in a couch." HFD Deputy Chief John Niland testified there were "mattresses throughout the whole store, including the basement," and confirmed the furniture is "all combustibles," and "couches which look like leather are really . . . a plastic byproduct."

When the fire started on the morning of October 24, 2018, Juan Abreu was the only B&S employee at the store. The record contains no direct testimony from Abreu; he was not deposed nor did he ever provide a certification or sworn

6

testimony. Throughout the litigation, the parties were unable to locate or contact Abreu, except that B&S's expert, Steven McDougall, obtained a statement from Abreu by phone on the morning of November 1, 2018.

In that statement, Abreu reported he "saw fire high near the ceiling, going from the right rear towards the left rear . . . way back near the breakroom" on the first floor, but "could not see what was on fire." He then apparently "ran out the front door" and "spoke with police," who were nearby to direct traffic while the construction site received a delivery, to report the fire. As memorialized in McDougall's report, Abreu stated he "did not go towards the fire area to get a closer view or try to put out the fire." An eyewitness, the project manager working on the neighboring construction, reported to HFD Deputy Chief Niland that he observed "a gentleman c[o]me running out, saying there was a fire."

Hackensack Police Department records indicated officers took statements on the scene from Abreu, B&S's manager Badran, its owner, another employee who left the store prior to the fire, and the project manager, but those statements were not included in the record before us. It is undisputed none of these individuals associated with B&S, except Abreu, were present when the fire began.

7

Other HFD records reflected the alarm sounded at 10:41:34 and firefighters arrived on scene at 10:44:49. HFD Deputy Chief Stephen Kalman testified at his deposition he concluded the fire was "extremely advanced and quick moving," based on his experience and the short time between the report and arrival. Deputy Chief Niland explained, when he entered the building, he observed "fire left to right, up and down," and noted he had "never seen that volume of fire actually being in the building like that." He agreed the volume and spread of the fire was "attribut[able] to the significant amount of fuel load." Deputy Chief Annunziata estimated the fire was "probably burning for . . . [ten] to [fifteen] minutes before it showed itself," but "it probably wasn't burning all that long before it reached that intensity, because of the fuel load in the store." Firefighters were able to control the fire after several hours but remained on scene into the night to fully extinguish the blaze.

As a result of the fire, the north brick wall of 153-155 Main Street collapsed onto 157-159 Main Street, where Art of Spice was located, resulting in "[h]eavy damage" to the "roof, second, and first floors" of that building. Because of the resulting structural instability, what remained of 153-155 Main Street was later demolished with heavy equipment. The neighboring buildings

8

on both sides also sustained "varying degrees of heat, smoke, and water damage."

HFD investigated the fire's cause and origin but was unable to conclusively determine either because of the "extensive fire damage" to the building. It found "the most significant fire damage was in the center rear" of the first floor and decreased outward, but the specific area and level of origin, first ignition material, ignition sequence and spread pattern remained unknown. Deputy Chief Niland testified at his deposition he understood, based on Abreu's statement to "either the insurance investigators and/or the police," there were mattresses and other "ordinary furniture" stacked in the center rear of the building with the most fire damage, but he did not know how high the stacks were. According to Abreu's statement to McDougall, "[m]aterials near the rear of the store" where the fire began "included boxes, dining room furniture, plastic bags, rugs, and water for a water cooler."

Plaintiffs' expert, Gerard J. Naylis, prepared three reports, dated October 13, 2021, June 17, 2022, and July 1, 2022. Among other points, in his October 13th report, Naylis stated "due to the level of damage access to the building after the fire was deemed unsafe" and "no definitive cause of the fire could be made," but agreed the "area of origin [was] the first floor of the fire building in the rear

A-0160-22

of the store." He also opined "[a] fire involving furniture, mattresses and household goods would generate copious amounts of smoke," consisting of "hot gases and unburned particulate matter" which would "further spread the fire" when "heated to an ignition temperature." Naylis further explained "[i]f there had been automatic sprinklers [o]n the first floor . . . [they] would have been able to contain and control the fire," and automatic sprinklers would have been required "[u]nder the current building code." He concluded "[g]iven recent experience with fires in furniture and retail establishments, best practice would have been to install automatic fire sprinklers on a retrofit basis."

Relying on interrogatory responses from B&S's owner, who was not present at the time of the fire, Naylis stated Abreu "observe[d] smoke and possibly fire in the rear of the store" at "approximately 10:30 a.m." but did not report the fire until 10:42 a.m., which, adding HFD's two-minute travel time, resulted in a "total of [fourteen] minutes" between initial observation of the fire and HFD's arrival. Naylis reasoned a "[fourteen-]minute delay in transmitting an alarm to the fire department would allow a small fire to grow substantially and spread in the furniture store" as well as "to create untenable conditions . . . requiring the fire fighters to retreat and fight this fire in a defensive manner." He added "[a]ny delay in reporting the fire would allow [it] to grow in size and

10

intensity." Notably, Naylis did not explicitly conclude the result would have been different with a shorter or no delay.

Naylis' June and July 2022 supplemental reports, served approximately six months following the close of discovery, but lacking any accompanying certification of due diligence as required by Rule 4:17-7, expanded upon the opinions expressed in his timely served October 2021 report. Specifically, he explained "[o]nce a fire starts in an un-sprinklered location in a furniture store, the heavy fire load means that the fire is likely to spread quickly" and "automatic sprinklers would have been able to contain and control the fire." He concluded, "[i]n light of what current codes require, its knowledge of prior violations, what it knew or should have known about the alarm system and sprinkler system and the typical, heavy fire load furniture stores represent, [B&S] knew or should have known that it created an unreasonable risk of fire to neighboring properties."

McDougall also prepared two reports, dated March 6, 2019 and December 7, 2021. In his first report, McDougall stated the "[d]emolition of the structure impaired the ability to locate fire patterns or determine the fire cause," but he also agreed the fire "originated in the first-floor rear within the showroom area."

11

He noted the "large fire load" "prevented fire[fighters] from being able to quickly put out the fire."

McDougall's supplemental report addressed the alleged delay in reporting. He stated he spoke with Abreu by phone in November 2018, when Abreu relayed the information noted, supra. McDougall concluded there was no delay, as Abreu immediately reported the fire to police, and HFD responded quickly due to the relatively short distance between the firehouse and 153-155 Main Street. He opined Naylis' contrary conclusion "ignores first-hand witness accounts, as well as fire and police reports, which are primary documents and more accurate" than the interrogatory responses from B&S's owner who was not present.

After the close of discovery, B&S moved for summary judgment. In support, it contended it owed no duty to any neighboring properties for the fire damage, and even if it did, plaintiffs failed to demonstrate a breach of that duty as they had not established the cause of the fire through expert testimony, and there were no outstanding fire code violations at the time of the 2018 fire. B&S also requested the court exclude the June and July 2022 supplemental Naylis reports, noting they were served six months after the close of discovery, and devoid of the requisite certification of due diligence as required by Rule 4:17-7. Based on the record before us, it does not appear the court ruled on B&S's

A-0160-22

request to bar the supplemental Naylis reports. We note, however, that the court's written order refers to plaintiffs' expert report in the singular.

Farmers opposed B&S's application and maintained the motion record contained genuine and material factual questions as to whether B&S (1) negligently allowed "the accumulation of flammable materials" in a space with no fire suppression systems to create a fire hazard; and (2) through its employee, failed to exercise reasonable care in undertaking to investigate the cause of the fire, resulting in a delay in reporting the fire to HFD. Farmers also contended it was not required to establish the cause of the fire by expert testimony as "the relevant inquiry is whether it was foreseeable that neighboring property owners would be injured by B&S's actions or inactions with respect to the spread of the fire, not the fire's cause."

After considering the parties' submissions and oral arguments, the court entered a written order and accompanying statement of reasons on August 23, 2022 in which it granted B&S's application and dismissed Farmers' complaint. In doing so, the court distinguished Scully v. Fitzgerald, 179 N.J. 114 (2004); Menth v. Breeze Corp., Inc., 4. N.J. 428 (1950); B.W. King, Inc. v. Town of West New York, 49 N.J. 318 (1967); and Saldana v. DiMedio, 275 N.J. Super. 488 (App. Div. 1994), a line of cases imposing liability on property owners for

maintaining dangerous conditions that posed a foreseeable risk of fire.  As the court explained, unlike the "flammable materials on site and the foreseeability of activities by third persons to bring about a fire" in those cases, here the court found "there were no activities which would have alerted the owner/occupier of the foreseeability of fire and fire spreading to adjoining properties."

The court further reasoned "[t]here was nothing intrinsic to the operation of the retail establishment nor activities by third persons which would have alerted a reasonable person to a fire hazard beyond that which exist[ed] generally."  The court also found the fact the store was classified as a "heavy fire load" did not "indicate a foreseeability of a fire or activities which would bring about a fire."

Additionally, the court explained defendants' failure to adopt the HFD recommendations to install fire protection systems was not evidential of B&S's negligence.  Specifically, it noted "it is undisputed that the building complied with all fire codes applicable to it" and "[r]ecommendations, absent the force of regulations, standards or codes are not the basis for imposing a duty absent a foreseeable condition requiring action."

With respect to Farmers' delay theory, the court found B&S's interrogatory response, relied upon by Naylis and plaintiffs to determine the time the fire

14

began, and thus the extent of the delay, was "undoubtedly not exact or precise." It noted B&S's owner was not present at the time of the fire and his interrogatory response was "an inadequate foundation absent other independent facts to support [Naylis'] opinion." The court concluded "[t]he only fact in the record as to when the fire started is 'about 10:30,'" which was "too imprecise to permit an expert to use as the fixed time at which Mr. A[br]eu learned of the fire and delayed from there." It also pointed out Naylis "does not indicate that a lesser amount of time would have brought about the result." In sum, the court found "[t]here is not reliable information in the discovery as to permit an opinion as to delay in the reporting of the fire." This appeal followed.

## II.

Before us, Farmers reprises many of the same arguments it raised before the court. First, relying upon Scannavino v. Walsh, 445 N.J. Super. 162 (App. Div. 2016), and Burke v. Briggs, 239 N.J. Super. 269, 275 (App. Div. 1990), Farmers argues B&S failed to exercise reasonable care in the use of its property by maintaining it in an unsafe condition, namely, as a furniture store with a "high fire load" but no sprinklers or monitored alarm system. On this point it relies on D'Andrea v. Guglietta, 208 N.J. Super. 31, 36 (App. Div. 1986), and contends, unlike dangerous conditions created naturally, "[t]he conditions

15

created by B&S [in] maintaining a high fire load" in its store were artificial and thus actionable.

Next, relying primarily on Menth, 4 N.J. at 440, Farmers also argues an "occupant of premises on which a fire accidentally starts is liable for the communication of the fire to neighboring properties if he is guilty of negligence in connection with its origin or escape" and a "property owner can be held liable to neighboring owners 'if such act was reasonably foreseeable as the natural and probable consequence of the negligent manner in which the premises were kept.'" As applied to the facts, Farmers posits because B&S "created the danger" by storing mattresses and furniture in an area lacking fire protection systems and "knew or should have known of the risks involved, it owed a duty to neighboring property owners, including the one insured by Farmers." It contends the fire was "reasonably foreseeable as the natural and probable consequence of" B&S's storing flammable materials in an area without sprinklers or monitored alarms, particularly because the HFD had recommended installation of these protection systems.

Farmers also maintains the court failed to properly consider whether B&S was negligent in failing to make "reasonable use of" the property, which requires under Burke, 239 N.J. Super. at 275, an examination of "various attendant facts

16

and circumstances" of that use including "the nature of the incident, the danger presented by the [condition], whether [defendant], by making inspections, could or should have known of [the] condition, [and] what steps [defendant] could have taken to prevent it from [damaging] plaintiffs' property." Notably, on this point, Farmers stresses, contrary to the court's conclusion, the "presence or absence of a fire code violation does not resolve the issue of negligence."

In requesting we affirm, B&S argues the failure to install fire protection systems recommended but not required by statute or code does not constitute negligence where, as here, "there were no third persons or activities that would have alerted [it] about the foreseeability of fire occurring and fire spreading." Relying upon Dowler v. Boczkowski, 148 N.J. 512 (1997), it contends the failure to install fire protection equipment not required by fire code or statute is not negligent as a matter of law.

B&S maintains its classification as a "heavy fire load" was "merely a label to mention to the fire department . . . so they have an idea of what type of business is involved in the fire," and nothing in the record demonstrated it had a heavier fire load than other typical furniture stores, or that any furniture was improperly stored at the time of the fire. Alternatively, it argues Farmers' "theory is flawed factually because the fire never spread to the Art of Spice

17

premises," but rather the building "only sustained heat, water damage and smoke damage" in addition to roof damage from "a falling masonry wall."

Second, Farmers contends the delay between 10:30 a.m., when B&S employee Abreu "is reported to have observed smoke and or fire"; 10:42 a.m., when HFD received reports of the fire; and 10:44 a.m., when HFD arrived; allowed the fire "to grow in size and intensity." Farmers argues Abreu "took it upon himself to investigate where the fire was coming from and failed to notify the authorities in a prompt manner." In doing so, it concludes, B&S is "subject to liability . . . for physical harm resulting from [Abreu's] failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm[] is suffered because of the other's reliance upon the undertaking."

Farmers asserts there were "issues of material fact regarding: a) the notification of the fire to the authorities . . . b) what [B&S] employees did for [fourteen] minutes[,] c) why no one called 911 for [fourteen] minutes[, and] d) the known fire load and the spread of the fire." It argues "[w]hat particular duration of time failing to report the fire to the fire department amounts to negligence is clearly a fact determination to be made by the jury."

As it did before the court, B&S argues a review of the competent evidence in the motion record leads to the conclusion, "there was no unreasonable delay in [Abreu's] reporting of the subject fire." On this point, it highlights the statement of an eyewitness who indicated Abreu "came running out" and alerted a police officer to the fire. Additionally, it maintains "discovery has not revealed any actual delay in . . . Abreu reporting the fire other than the time required for him to run out of the burning building and run to a police officer who was nearby." Further, B&S stresses Abreu was not deposed and "it is unknown exactly what time he observed the fire," and B&S's owner, upon whose statements Farmers relies, "was not present in the premises when the fire started and would not know exactly when the fire started but was merely estimating."

For the reasons that follow, and as previously noted, we agree with Farmers in part. Specifically, we conclude genuine and material questions of fact existed in the motion record concerning B&S's negligence solely with respect to whether it exercised reasonable care in storing flammable materials, such as mattresses and furniture, in an area without fire suppression or notification systems. We reject Farmers' arguments that B&S was liable on any delayed reporting theory.

III.

We first address the applicable standard of review guiding our analysis with respect to the challenged order. Summary judgment decisions are reviewed de novo, C.V. v. Waterford Twp. Bd. of Educ., 255 N.J. 289, 305 (2023), applying the same standard as the trial court, Townsend v. Pierre, 221 N.J. 36, 59 (2015). Like the motion judge, we "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill, 142 N.J. at 540. Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment or order as a matter of law." Id. at 529 (quoting R. 4:46-2(c)).

We next address the relevant and substantive legal principles. A negligence claim requires a plaintiff to "establish four elements: (1) that the defendant owed a duty of care; (2) that the defendant breached that duty; (3) actual and proximate causation; and (4) damages." New Gold Equities Corp. v. Jaffe Spindler Co., 453 N.J. Super. 358, 377 (App. Div. 2018) (quoting Fernandes v. DAR Dev. Corp., 222 N.J. 390, 403-04 (2015)). "To act non-

20

negligently is to take reasonable precautions to prevent the occurrence of foreseeable harm to others." Id. at 377-78 (quoting Fernandes, 222 N.J. at 404).

"Proximate cause 'requires an initial determination of cause-in-fact' . . . [which] 'requires proof that the result complained of probably would not have occurred but for the negligent conduct of the defendant.'" Morris Props., Inc. v. Wheeler, 476 N.J. Super. 448, 459 (App. Div. 2023) (alterations in original) (quoting New Gold Equities, 453 N.J. Super. at 379). "The plaintiff then 'must present evidence to support a finding that defendant's negligent conduct was a "substantial factor" in bringing about plaintiff's injury, even though there may be other concurrent causes of the harm.'" Id. at 459-60 (quoting Froom v. Perel, 377 N.J. Super. 298, 313 (App. Div. 2005)). "Generally, the determination of proximate cause is an issue of fact for the [factfinder]." New Gold Equities, 453 N.J. Super. at 379 (alteration in original) (quoting Cruz-Mendez v. Isu/Ins. Servs. of San Francisco, 156 N.J. 556, 576 (1999)).

Premises liability flows from "legal possession and control" over the site of a dangerous condition. Taylor v. N.J. Highway Auth., 22 N.J. 454, 460-61 (1956). Generally, a property owner or occupier is "not liable for the spread of a fire which is accidentally started thereon by the act of a stranger or by some other cause with which he is not connected, unless he is guilty of negligence in

21

respect to the condition of his premises . . . ." Menth, 4 N.J. at 439. In other words, where a landowner "keeps [their] 'premises in an unsafe and dangerous condition' due to the accumulation of flammable materials," they are responsible to a neighboring property owner for fire-related damage, "provided the fire and its spread were reasonably foreseeable." Scully, 179 N.J. at 124 (quoting Menth, 4 N.J. at 439-40).

Our Supreme Court has on several occasions addressed the question of liability for damage to neighboring property owners caused by fire. In Menth, a fire destroyed a nearby apartment building after spreading from a storage shed leased by the defendant. 4 N.J. at 432-33. In the shed, which was made of wire and a tar paper roof, defendant stored empty oil-soaked burlap bags it used to transport aluminum shavings from its factory to another shed. Id. at 433. Although the exact origin of the fire was undetermined, it spread from "smoke and a little flame on the floor" to a blaze engulfing the apartment building "very rapidly and intensely," in the time one of defendant's staff went into another building to retrieve a fire extinguisher. Id. at 433-34.

The Court affirmed our reversal of the trial court's dismissal, concluding a reasonable jury could have found "the condition in which the defendant kept and maintained the shed in question"—namely, "storing a quantity of highly

A-0160-22

combustible materials in an open shed with wire sides and a frame and tar paper roof, three feet away from a three-story frame apartment house"—"was one from which a person of ordinary experience and intelligence would have foreseen that the result complained of might ensue and, therefore, such was the proximate cause of the destruction of plaintiffs' property."  Id. at 439, 443-44.  It reasoned a defendant who permitted flammable material to accumulate on their property, "creat[ing] a fire hazard to adjoining property," had a duty to "exercise 'reasonable foresight for harm.'"  Id. at 440 (quoting Beck v. Hines, 95 N.J.L. 158, 162 (E. & A. 1920)).

In sum, the Court explained:

> We know of no decision which holds that one who maintains his property so negligently that it menaces his neighbors, is liable for the destruction of their premises by fire which started upon his, only in the event that he himself applies the match. To the contrary, we are satisfied that the owner's negligence is the proximate cause of the damage to the neighbor, even if a stranger communicated the spark; unless the circumstances are such that no prudent person would have anticipated the stranger's act.
>
> [Id. at 441 (quoting Arneil v. Schnitzer, 144 P.2d 707, 717 (Or. 1944)).]

In B.W. King, the Court revisited the issue.  49 N.J. at 322.  Defendant's property included two piers historically used for coal barges which were in

23

"disrepair," made of "old and dry and in sections rotted and decayed" wood and covered with "wood debris, lumps of coal and coal dust." Id. at 323. While defendant was aware of frequent trespassing on the piers, it did not fence them off or otherwise prevent access. Ibid. A trespasser threw away a lit cigarette, which ignited the piers, ultimately resulting in their destruction as well as the fire's spread to adjoining property owned by plaintiffs. Ibid.

The Supreme Court held a property owner is liable for a fire not started through their own actions "only where the premises are in an unsafe and dangerous condition or the owners fail to take reasonable means to prevent the spread of fire." Id. at 327. It described such "an unsafe and dangerous condition" as "an unusually hazardous situation affirmatively created or maintained by the owner which gives rise to an extraordinary and undue risk of combustibility," generally "aris[ing] from the type of use to which the building is put and either the resulting accumulation of flammable material therein or the increase of the flammability of the structure itself, from the use to which it was put." Id. at 328.

Finding a material factual question as to "whether the flammability of the pier was increased by the accumulation of the by-products of its use for coal loading and whether a reasonably prudent man would have employed some

24

method of 'housekeeping' to remove or eliminate any such and any other flammable material," the Court reversed the court's order for judgment for defendant notwithstanding the verdict and remanded for a new trial. Id. at 329.

Most recently, in Scully, the court again examined whether defendant's allegedly negligent maintenance of his property could lead to liability for the spread of a fire. 179 N.J. at 118. In that case, defendant owned adjoining commercial and residential buildings, behind which there was an open storage area containing "a gas engine lawn mower, a gas engine snow blower, gasoline, mulch, old papers and other refuse that had accumulated over time, construction debris, and garbage that was both in and out of trash cans." Id. at 119-20. Defendant's tenants "regularly smoked cigarettes on the deck above the storage area" and threw the butts "in and near the storage area." Id. at 120. A fire, the exact cause of which could not be determined, started in the storage area, destroyed the residential building, and "significantly damaged" the commercial building in which plaintiff leased an office. Id. at 119.

Relying upon Menth and B.W. King, the Court held

> a landowner will be liable if he maintains his property in the condition of a tinderbox and takes inadequate precautions to guard against the risk of fire when it is reasonably foreseeable that an errant spark from a trespasser's or stranger's discarded match or cigarette will ignite a blaze that will spread and engulf

25

neighboring properties, [as] the unsafe and dangerous condition of the property gave rise to the foreseeable threat of fire.

[Id. at 125.]

It reiterated its analysis "must focus on whether the storage of items on defendant's property, in view of the surrounding circumstances, 'was one from which a person of ordinary experience and intelligence would have foreseen that the result complained of might ensue and, therefore, such was the proximate cause of the destruction of plaintiff['s] property.'" Id. at 126 (alteration in original) (quoting Menth, 4 N.J. at 444).

The Court rejected defendant's attempt to distinguish the materials stored on his property from the "inherently dangerous" materials in Menth and B.W. King, finding although "the materials in those cases were qualitatively different and more highly combustible than the uncontained trash and debris in defendant's storage area," the "exposed collection of papers and refuse" was nonetheless "flammable and, therefore, potentially dangerous." Ibid. Further, it reasoned the fire was foreseeable as defendant could have found cigarette butts in the area by inspecting the property, and "minimized or eliminated the risk of fire" by placing the trash and debris in a trash bin. Ibid.

26

The Court also concluded plaintiff was not required to provide expert testimony establishing a statutory or regulatory standard of care, noting "[c]ertain dangerous conditions that create the foreseeable risk of fire are well known to ordinary people and are a matter of common knowledge." Id. at 127. Ultimately, the court affirmed our reversal of summary judgment for defendant, finding it was "for the jury to determine what evidence is credible, what inferences are to be drawn from the evidence, whether defendant breached a duty owed to plaintiff, and last, whether that breach was a proximate cause of the injury suffered by plaintiff." Id. at 130.

When considering whether the defendant breached a duty, we note "[c]ompliance with a legislative enactment or an administrative regulation does not prevent a finding of negligence where a reasonable [person] would take additional precautions." Feldman v. Lederle Labs., 257 N.J. Super. 163, 168 (App. Div. 1992) (quoting Restatement (Second) of Torts § 288C (Am. L. Inst. 1965)). On this point, our Supreme Court explained regulations "represent minimum standards and do not establish the complete duty of the [defendant] under all circumstances." Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 412 (2014) (quoting Black v. Pub. Serv. Elec. & Gas Co., 56 N.J. 63, 77 (1970)). Simply put, compliance with regulatory codes and standards may be "evidence

27

of due care but is not conclusive on the subject." Id. at 411 (quoting Black, 56 N.J. at 77).

Here, as "a tenant or lessee occupying premises to which third parties are invited," B&S "owe[d] a duty to use ordinary care to have the premises in a reasonably safe condition." O'Connell v. N.J. Sports & Exposition Auth., 337 N.J. Super. 122, 128 (App. Div. 2001). The question, then, is whether, by storing flammable furniture and mattresses in a building without monitored alarms or sprinklers, B&S maintained its premises in "an unsafe and dangerous condition" such that its conduct constituted a breach of that duty on the extant summary judgment record. Scully, 179 N.J. at 124 (quoting Menth, 4 N.J. at 439-40).

We are satisfied when considering the motion record in the light most favorable to Farmers, the evidence was not "so one-sided that [B&S] must prevail as a matter of law." Brill, 142 N.J. at 533. Genuine and material factual questions existed regarding "whether the storage of [flammable furniture constituting a 'heavy fire load'] on [B&S]'s property, in view of the surrounding circumstances," particularly the lack of fire protection systems, "'was one from which a person of ordinary experience and intelligence would have foreseen that the result complained of might ensue and, therefore, such was the proximate

cause of the destruction of [Farmers' insured] property.'" Scully, 179 N.J. at 126 (quoting Menth, 4 N.J. at 444).

For example, Deputy Chief Annunziata testified at his deposition all furniture stores present a "heavy fire load." Although the record is sparse as to the precise condition of the store at the time of the fire, various witnesses described the type of items they had seen in the store, including "a lot of furniture, a lot of cardboard, and a lot of plastics"; "mattresses throughout the whole store"; "display lamps on tables near furniture that may have had extension cords powering them"; and "boxes, dining room furniture, plastic bags, [and] rugs." Deputy Chief Niland attributed the volume and spread of the fire to the "significant amount of fuel load" in the store.

As in Scully, these items may not have been "inherently dangerous," but were nevertheless "flammable and, therefore, potentially dangerous." Id. at 126. Plaintiffs' expert Naylis explained "[a] fire involving furniture, mattresses, and household goods would generate copious amounts of smoke," creating "additional fuel that when heated to an ignition temperature will further spread the fire." Deputy Chief Annunziata also testified, with respect to the flammability of furniture, "there[ are] a lot of petroleum products in a couch." Deputy Chief Niland agreed the furniture was "all combustibles."

Further, competent evidence in the record demonstrates a pattern of improper storage of these materials by B&S. In addition to citations regarding the basement and second floor, HFD issued at least one citation to B&S for improperly storing items closer than two feet to the ceiling on the first floor. Mixtli owner Agustin Gomez also testified he observed mattresses and "more stuff" on the second floor—despite HFD's admonitions that no storage was permitted on that floor—"a couple of times," as recently as the year leading up to the fire. It would be reasonable to infer based on this history, certainly for purposes of summary judgment, that B&S may have improperly stored furniture on the date of the fire, informing the factfinder's determination of whether it exercised due care.

Additionally, although perhaps not sufficient to establish negligence standing alone, HFD recommended installation of fire suppression systems on the first floor. When combined with the flammable materials present in the store and history of improper storage demonstrated by the record, we are convinced a material factual question existed with respect to whether B&S was on notice that some higher level of fire protection was necessary to keep the premises reasonably safe, precluding summary judgment. In other words, a "person of ordinary experience and intelligence," id. at 125, could foresee a showroom

30

containing "a lot of furniture," including some containing petroleum products, "a lot of cardboard, and a lot of plastics"; "mattresses throughout the store"; "display lamps on tables near furniture that may have had extension cords powering them"; and "boxes, dining room furniture, plastic bags, [and] rugs," but no sprinklers or other fire suppression systems, would provide fuel permitting a fire to spread quickly.

We note Farmers' theory of liability is not that B&S's maintenance of the property negligently permitted a fire to start, but that it permitted any fire that did start, for whatever reason, to spread. Accordingly, that B&S was aware of no smoking trespasser or third party adding to the fire hazard as in B.W. King or Scully, does not compel a different result. Instead, our conclusion is informed by Menth, in which the Court found plaintiff established a prima facie case of negligence based solely on defendant's allegedly negligent maintenance of flammable materials on the property, which allowed the "little flame on the floor"—the cause of which was unknown—to grow and spread "very rapidly and intensely." Menth, 4 N.J. at 433-34, 443-44.[2]

---

[2] We acknowledge "the result complained of" in Menth, 4 N.J. at 444, was different than that at issue here, as the fire itself spread to the plaintiff's property rather than causing only collateral damage. Similarly, we recognize the record contains no suggestion of a trespasser or third party starting the fire at 153-155

Additionally, as noted, compliance with regulations or statute is not dispositive "where a reasonable [person] would take additional precautions." Feldman, 257 N.J. Super. at 168 (quoting Restatement (Second) of Torts § 288C). Accordingly, that fire code did not require installation of a monitored alarm or sprinkler system does not absolve B&S of liability. While B&S's compliance with the fire code may be "evidence of due care," it is "not conclusive on the subject." Davis, 219 N.J. at 411 (quoting Black, 56 N.J. at 77). Again, at minimum the record presents a question of material fact as to whether a reasonable person would have taken additional precautions under these circumstances.

Further, we find B&S's reliance on Dowler without merit as the facts there are clearly distinguishable. In that case, the Court considered whether the implied warranty of habitability imposes upon a landlord a duty to install smoke detectors in a particular room of a residential rental unit. 148 N.J. at 521-22. It concluded, where no law required smoke detectors or regulated their placement for the property at the time of the fire causing the tenants' injuries, the landlord did not breach the implied warranty of habitability by failing to place a smoke

---

Main Street, unlike B.W. King and Scully. Nevertheless, we find the principles set forth in all three cases applicable to the circumstances before us and persuasive as to the legal arguments set forth by the parties.

detector in the bedroom. Id. at 524. Additionally, the Court found "the absence of a smoke detector at a given location is readily apparent to a tenant," and the tenants in Dowler did not complain about the placement of the detectors nor install detectors and deduct the costs from rent, as permitted by Marini v. Ireland, 56 N.J. 130, 146 (1970). Dowler, 148 N.J. at 521-22.

Here, in contrast, the issue is whether B&S owed Farmers' insured, a neighboring landowner rather than a tenant, a duty to "exercise 'reasonable foresight for harm'" with respect to the flammable materials accumulated on its property. Menth, 4 N.J. at 440 (quoting Beck, 95 N.J.L. at 162). Nothing about this case implicates the implied warranty of habitability or the responsibilities of a landlord to their residential tenant. Further, unlike the "readily apparent" absence of a smoke detector to the tenants in Dowler, 148 N.J. at 521-22, here there is no evidence the plaintiffs had reason to know 153-155 Main Street lacked fire suppression systems, nor did they have any remedy to correct the situation themselves.

Finally, B&S's contention that it is not liable because the fire itself never spread to Art of Spice, Farmers' insured, simply lacks merit. The record reflects Art of Spice suffered damage from "heat, smoke, and water" as well as the collapse of the wall onto its roof. B&S suggests no other cause of this harm

besides the fire.  That the fire did not actually reach Art of Spice's location does not mean it was not foreseeable that a fire would harm neighboring buildings, or that it was not the proximate cause of the aforementioned damage.

We reach a different conclusion with respect to Farmers' second theory that B&S was negligent for failing to report the fire in a timely fashion.  Having reviewed the record against the aforementioned legal principles, we are satisfied the court correctly concluded the motion record failed to create a genuine and material question of fact with respect to B&S's liability to Farmers for the losses suffered by its insured based on Abreu's alleged failure to notify in a timely fashion the fire department.

Farmers points to no competent evidence in the record creating any material factual issue regarding any delay in Abreu's reporting.  As the court found, the only source supporting Farmers' and its expert Naylis' position that the fire started at 10:30 a.m. is B&S's interrogatory response.  It is undisputed B&S's owner was not present at the fire and did not observe its inception.  His answers to interrogatories do not explain how he became aware the time fire started.  At best, the answer was based on hearsay from an unidentified person who was present at the fire, and at worst, it was a vague estimate untethered to any basis in fact.  As the court aptly noted, the interrogatory answer is "an

34

inadequate foundation absent other independent facts to support the opinion" espoused by Naylis that B&S was negligent based on Abreu's delay in reporting. Our review of the record revealed no competent evidence of the time the fire started.

Defendants' expert, McDougall, was apparently the only person to speak with Abreu, and according to McDougall's supplemental report, Abreu stated once he became aware of the fire, he "ran out the front door." This is supported by the statement on scene of the project manager from the neighboring construction, who observed a "gentleman c[o]me running out, saying there was a fire." There is simply nothing in the record supporting or even suggesting a claim that Abreu undertook to investigate or attempt to put out the fire, or that he negligently delayed reporting it. As we are satisfied no reasonable juror could conclude otherwise, we find summary judgment for B&S on the delay theory was appropriate.

Farmers also argues it was not required to establish the fire's cause by expert testimony. We need not substantively address this issue, which B&S raised below but does not reprise before us. We note the court did not grant B&S summary judgment based on the lack of expert testimony regarding the fire's cause, which all parties agree has never been determined. Further, we are

satisfied Naylis' October 2021 report adequately addresses, for purposes of summary judgment, Farmers' theory that B&S's conduct in storing flammable materials in an area with no fire suppression system permitted the fire to spread and damage Farmers' insured. Again, Naylis opined "[i]f there had been automatic sprinklers in the first floor of the furniture store the automatic sprinklers would have been able to contain and control the fire," and installation of sprinklers "would have protected not only this building but surrounding exposures as well."

Finally, we also do not deem it necessary to address substantively B&S's argument that the court should have refused to consider Naylis' June 17, 2022 and July 1, 2022 reports and the opinions contained therein as mandated by Rule 4:17-7 for the following reasons. First and foremost, as is clear from the court's August 23, 2022 written statement of reasons, it did not consider those reports when reaching its decision. Second, we similarly have not considered those reports as they were unnecessary to resolve the issues before us because, contrary to B&S's contentions, the opinions contained in Naylis' timely October 13, 2021 report, combined with the other evidence in the motion record, are sufficient to create a genuine and material question of fact as to Farmers' theory that B&S was negligent based on the fire load in the building without any fire

suppression system in the location where the fire indisputably started. Similarly, nothing in those belatedly filed reports create a factual question with respect to Farmers' delay theory, again, for the reasons stated, <u>supra</u>.

With that said, on remand, in the event Farmers intends to rely upon the June 17, 2022 or July 1, 2022 reports for any purpose, the court should, in the first instance, address B&S's objections, make necessary factual findings and legal conclusions and memorialize its decision in a written order to facilitate further appellate review, if necessary. Nothing in our opinion should be interpreted as an expression of our views on any such application.

Affirmed in part, reversed in part and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0160-22